# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____
)
MCI WORLDCOM NETWORK                               )
SERVICES, INC., 500 Clinton Center Dr.,            )
Clinton, MS 39056; and                             )
MCIMETRO ACCESS                                    )     Civil Action No. AMD 00-CV-1518
TRANSMISSION SERVICES LLC,                         )
500 Clinton Center Dr., Clinton, MS 39056,         )
)
            Plaintiffs,                            )
)
       v.                                          )
)
VERIZON MARYLAND INC.,                             )
f/k/a Bell Atlantic-Maryland, Inc.,                )
One East Pratt Street, Constellation Place,        )
Baltimore, MD 21202 (residing in all Maryland      )
counties); the MARYLAND PUBLIC SERVICE             )
COMMISSION, William Donald Schaefer Tower,         )
6 St. Paul Street, Baltimore, MD 21202 (residing   )
in Baltimore City); ~~GLENN F. IVEY~~ KENNETH D. SCHISLER, in  )
his ~~———~~ official capacity as Chairman of the Maryland      )
Public Service Commission, William Donald          )
Schaefer Tower, 6 St. Paul Street, Baltimore, MD   )
21202 (residing in Baltimore City); and            )
~~CLAUDE M. LIGON, SUSANNE BROGAN,~~ ~~———~~        )
~~CATHERINE I. RILEY, and~~ J. JOSEPH ~~————~~ CURRAN, III, GAIL C. MCDONALD,    )
RONALD A. GUNS, and HAROLD D.                      )
WILLIAMS, in their official capacities  )
as ~~————~~ Commissioners of the Maryland  )
Public Service ~~————~~ Commission, William  )
Donald Schaefer Tower, ~~———~~ 6 St. Paul Street,  )
Baltimore, MD 21202 ~~————~~ (residing in Baltimore City),                    )
)
            Defendants.                            )
_____)

## ~~FIRST~~ SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND EQUITABLE RELIEF

Plaintiffs MCI WORLDCOM Network Services, Inc. and MCImetro Access Transmission Services LLC (collectively "~~WorldCom~~MCI")[1], by and through undersigned counsel, for their complaint against Verizon Maryland Inc. (formerly known as Bell Atlantic-Maryland, Inc., and referred to herein as "Verizon"), the Maryland Public Service Commission ("Commission" or "MPSC"), and Commissioners ~~Glenn F. Ivey, Claude M. Ligon, Susanne Brogan, Catherine I. Riley and~~Kenneth D. Schisler, J. Joseph Curran, III, Gail C. McDonald, Ronald A. Guns, and Harold D. Williams (collectively "Commissioners") in their official capacities, hereby complain and allege as follows:

## NATURE OF THE ACTION

1.    This action is asserted to enforce various provisions of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C.

~~1.        This action is asserted to enforce various provisions of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C.~~ §§ 151 et seq. ("1996 Act" or "Act"), a landmark statute designed to open local telephone markets to competition.  The 1996 Act was passed to end the historical regime in which incumbent local telephone companies (such as Defendant Verizon) monopolized the "facilities" (the network equipment) and services through which consumers place and receive all local and long distance calls.  In its place, the 1996 Act mandates a new competitive structure.  To that end, the Act preempts state and local barriers to market entry and requires incumbents to provide new entrants into local telecommunications markets (such as ~~plaintiff WorldCom~~Plaintiff MCI) with access to the incumbents' telephone networks and services on rates, terms, and conditions that are just,

---

[1]/    During much of the proceedings before the Maryland Public Service Commission, Plaintiff MCI WORLDCOM Network Services, Inc. was known as MCI Telecommunications

reasonable, and nondiscriminatory.   These requirements are specifically intended to open monopoly local telephone markets to effective competition as quickly as possible.

2.                              In addition to obligating incumbents to open their networks to new entrants on pro-competitive terms, conditions, and rates, the Act sets forth a procedural mechanism to implement these requirements and hasten the development of competition.   Under this scheme, incumbents are required to negotiate in good faith with new entrants and to develop "interconnection agreements" specifying the terms and conditions upon which the new entrant may interconnect with the incumbent's network.

3.                              Where the parties cannot arrive at a complete interconnection agreement through voluntary negotiations, the Act gives the state commission the opportunity to conduct expedited administrative proceedings, designated as "arbitration" proceedings, to resolve disputed issues in a manner consistent with the substantive requirements of the Act and the implementing regulations adopted by the Federal Communications Commission ("FCC"). The state commission may thereby review the resulting interconnection agreement in order to determine whether it complies with the Act and the FCC's binding regulations.   Section 252(e)(6) of the 1996 Act, 47 U.S.C. § 252(e)(6), gives aggrieved parties a right to bring an action in federal district court to challenge the terms of an interconnection agreement, as finally approved or rejected by the state commission, on the ground that they are inconsistent with the 1996 Act or the FCC's implementing regulations.

4.                              On April 24, 2000, the Commission approved an interconnection agreement ("Interconnection Agreement" or "Agreement") between WorldCom and Verizon.  As

Corporation.  Plaintiffs MCI WORLDCOM Network Services, Inc. and MCImetro Access

approved, however, several portions of the Agreement MCI and Verizon.  The Commission held separate proceedings to determine the rates at which unbundled network elements would be offered under the agreement.   Those rates were subsequently changed in yet another proceeding on June 30, 2003.  As approved, the rates for the parties' interconnection agreement violate the Act and the FCC's regulations.  WorldCom MCI brings this claim under 47 U.S.C. § 252(e)(6) to seek redress from those unlawful provisions

§ 252(e)(6) to seek redress from those unlawful terms.

## JURISDICTION

5.        These claims arise under the Telecommunications Act of 1996, a law of the United States, and under the FCC's regulations implementing that Act.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337 and pursuant to Section 252(e)(6) of the Act, 47 U.S.C. § 252(e)(6).

## VENUE

6.        Venue in this District is proper under 28 U.S.C. § 1391(b). Defendant Commission resides in this District.  Upon information and belief, Defendant Verizon is a Maryland corporation authorized to do business in Maryland and is subject to personal jurisdiction in this District.  Also upon information and belief, Defendants Ivey, Ligon, Brogan, Riley and Curran all reside in the District of Maryland.  The events giving rise to the claims asserted herein occurred in this District.  This Court is thus the "appropriate" district court within the meaning of Section 252(e)(6) of the 1996 Act.

## PARTIES

Transmission Services LLC are both wholly owned subsidiaries of WorldCom, Inc.

7.         Plaintiff MCI WORLDCOM Network Services, Inc. is a corporation organized under the laws of the State of Delaware.  MCI WORLDCOM Network Services, Inc. provides long distance and other telephone services throughout Maryland and the rest of the United States.  MCImetro Access Transmission Services LLC is a corporation organized under the laws of the State of Delaware and is licensed to offer local telephone service in Maryland.  Through MCImetro Access Transmission Services LLC, ~~WorldCom~~MCI provides local telephone services in some areas of Maryland today and intends in the future to offer local telephone services throughout Maryland in competition with Defendant Verizon.  Both MCI WORLDCOM Network Services, Inc. and MCImetro Access Transmission Services LLC are wholly owned subsidiaries of WorldCom, Inc., which is a "telecommunications provider" and a "requesting telecommunications carrier" within the meaning of the Act.

8.         Upon information and belief, Defendant Verizon is a Maryland corporation that is authorized to do business throughout the State of Maryland and that resides in all counties of the State of Maryland.  Verizon is the largest monopoly provider of local exchange service throughout Maryland.  Verizon is an "incumbent local exchange carrier" within the meaning of Section 252(h)(1) of the Act and a "Bell Operating Company" within the meaning of 47 U.S.C. § 153(4)(A)-(C).

9.         Defendant Commission is an independent agency of the State of Maryland and is a "state commission" within the meaning of 47 U.S.C. § 153(41) and Sections 251 and 252 of the Act.

10.         Defendants ~~Ivey, Ligon, Brogan, Riley and Curran~~Schisler, Curran, McDonald, Guns, and Williams are Commissioners of the Maryland Public Service Commission.  They are being sued in their official capacities only.

## BACKGROUND

### The Local Telephone Monopoly

11.        Since the divestiture of the Bell System in the early 1980s, vigorous competition has characterized the long-distance telephone services market, resulting in much lower long-distance rates and much better service quality.  Local telephone service, however, remains the last major bastion of monopoly in the telecommunications industry. Incumbent local telephone companies exercise "bottleneck" control over the local telephone network, including the lines (or "local loops") serving each telephone subscriber.  Despite regulation by state public utility commissions, this monopoly power has produced anticompetitive rates for local services, hampered the development of new services, and deprived customers of the ability to choose their local service provider.  Almost all long-distance calls also originate and terminate through that same local network.  Incumbents thus have a monopoly over this long distance access function as well.  Because monopoly local telephone companies have been permitted to charge long distance carriers inflated "access charges" to originate and terminate long-distance calls, the local telephone monopoly has also artificially inflated long-distance rates over what they would be in a fully competitive telecommunications market.

12.        For a majority of telephone subscribers in Maryland, Verizon is the only available provider of "local exchange service" (local telephone service) and "exchange access service" (originating and terminating long distance calls).  In its service areas, Verizon has a monopoly in local exchange and exchange access services.

### The Local Competition Provisions of the 1996 Act

13.        The 1996 Act "provide[s] for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced

telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, 104th Cong., 2nd Sess. 113 (1996). The centerpiece of that policy framework is Congress's effort to bring effective competition to the historically monopolized local telephone markets.

14.          To help bring the benefits of competition to local telephone customers, Section 253 of the Act overrides any state laws (such as exclusive franchises) that have the "effect" of prohibiting any entity from offering any interstate or intrastate telephone service. The Act also conditions the ability of regional Bell Operating Companies ("Bell Companies"), incumbent local telephone companies that were formerly part of the Bell System, to enter the long distance telephone market within their service areas on their demonstrated compliance with the Act's provisions granting new entrants access to the Bell Companies' facilities and services. See 47 U.S.C. § 271(c)(1)(A), (2)(B).

15.          Congress recognized that local competition could not develop unless new entrants were afforded access to the bottleneck local exchange facilities that incumbent monopolies had constructed over decades with funds obtained from captive ratepayers. Because no new entrant could realistically compete in all markets through the exclusive use of its own facilities, and because Congress recognized that shared use of bottleneck facilities was sometimes more efficient than duplication of those facilities, the 1996 Act's scheme for facilitating local competition consists largely of a set of affirmative obligations on incumbent local carriers to make their facilities and services available for purchase or lease by new entrants.

16.        The Act requires incumbents to make their facilities available to new entrants in a variety of ways.  Under Section 251(c) of the Act, incumbents must, among other things: allow new entrants to interconnect their facilities with the incumbents' networks at "any technically feasible point" for the purpose of transferring calls to or from the incumbents' networks, see 47 U.S.C. § 251(c)(2); offer the constituent parts or "elements" of their networks for leasing by new entrants on an element-by-element or "unbundled" basis, see 47 U.S.C. § 251(c)(3); make any telecommunications service that the incumbent offers its own customers available to new entrants at wholesale so that new entrants may resell those services to their own customers, see 47 U.S.C. § 251(c)(4); and allow new entrants to construct facilities necessary for interconnection at the incumbents' premises, referred to as "collocation," see 47 U.S.C. § 251(c)(6).

17.        Congress also understood that incumbent local telephone companies would retain strong incentives to obstruct their prospective competitors' efforts to enter the local market.  In particular, Congress recognized that allowing incumbents to dictate the rates, terms, and conditions upon which their prospective competitors may access the incumbents' bottleneck facilities would stifle competition just as surely as statutory or regulatory restrictions on entry.  Therefore, the Act contains a number of provisions specifically designed to prevent incumbents from acting on their built-in incentives to price new entrants out of the market by charging unreasonable rates or imposing unreasonable and discriminatory conditions for interconnection, network elements, resale of incumbent services, and other statutorily mandated forms of competitive access.

18.        Section 251(c) provides that incumbents' rates, terms, and conditions for interconnection and unbundled network elements must be "just, reasonable, and

nondiscriminatory." Section 252(d)(1) provides that rates for interconnection and network elements must be "based on the cost . . . of providing the interconnection or network element," and specifically provides that cost-based rates may not be predicated upon "rate-of-return or other rate-based proceedings" of the sort that prevailed in the monopoly era. Section 252(d)(3) provides that incumbents must offer telecommunications services purchased by new entrants for resale at wholesale rates determined by subtracting from the incumbent's retail rates all costs the incumbent is able to avoid as a result of not providing the service at retail. Section 252(d)(2) requires charges for the transport and termination of traffic originating on another carrier's network to "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination" and that those costs be determined "on the basis of a reasonable approximation of the additional costs of terminating such calls." That section also specifically prohibits state commissions from engaging "in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls." The Act similarly constrains incumbents' pricing power as to other forms of competitive access, such as collocation and access to poles, conduits, ducts, and rights-of-way.

19.     The Act expressly authorizes the FCC to promulgate regulations implementing the Act's local competition provisions. 47 U.S.C. § 251(d). Pursuant to that authority, the FCC released its First Report and Order containing implementing regulations on August 8, 1996. Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98, First Report and Order ("Local Competition Order").

20.     Among other things, the Local Competition Order and the implementing regulations (i) prescribed a mandatory cost methodology, known as the

"Total Element Long Run Incremental Cost" or "TELRIC" methodology, for setting the rates at which an incumbent must lease the individual components of its network, known as unbundled network elements ("UNEs"), to new entrants, see. See Local Competition Order ¶¶ 672-732; 47 C.F.R. §§ 51.503-51.505; and (ii) established rules for determining the points in an incumbent's network at which new entrants may interconnect with the incumbent's network for the delivery of local exchange traffic, see Local Competition Order ¶¶ 192-212.51.505. The TELRIC methodology measures the forward-looking incremental cost of providing a network element by reference to "the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505.

21.    In addition, the FCC established a list of seven UNEs that incumbents were required to provide to new entrants. 47 C.F.R. § 51.319 ("Rule 319"). On review of the Local Competition Order, the United States Supreme Court remanded Rule 319 for the FCC to reconsider its unbundling rules in light of the language of the 1996 Act.[2] On remand, the FCC re-issued Rule 319 with a revised list of UNEs that incumbents are required to make available to new entrants. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98, Third Report and Order, FCC 99-328, ¶¶ 44, 51 (rel. Nov. 5, 1999) ("UNE Remand Order"); 47 C.F.R. § 51.319 (1999). The revised list includes the UNEs known as subloops and dark fiber. 47 C.F.R. § 51.319(a) (1999).

21.    On May 13, 2002, the Supreme Court issued a decision affirming the validity of the FCC's TELRIC methodology in all respects. See Verizon Communications Inc. v. FCC, 535 U.S. 467 (2002). The Court rejected incumbent carriers' assertion that "the cost of

_____

2/    See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 387-92 (1999).

providing a network element," 47 U.S.C. § 252(d)(1), must refer to "the past cost to an incumbent of furnishing the specific network element actually, physically, to be provided."  535 U.S. at  498; see also id. at 498-506.   The Court recognized that "[i]f leased elements were priced according to embedded costs, the incumbents could pass these inefficiencies to competitors in need of their wholesale elements. . . [and] [t]he upshot would be higher retail prices consumers would have to pay."  Id. at 512.  The Court concluded that the adoption of TELRIC was a reasonable exercise of the FCC's statutory duty to establish a pricing methodology.  See id. at 523.

### Negotiation and Arbitration of Interconnection Agreements

22.        ~~22.~~    Section 252 of the 1996 Act sets forth an expedited procedure for implementing the Act's substantive provisions.  Under Section 252(a), incumbents are required to negotiate in good faith with any requesting telecommunications carrier concerning the terms and conditions governing interconnection, access to network elements, resale and other issues that must be resolved to allow for competitive entry.  The Act provides for a fixed period of negotiations during which the parties may voluntarily agree to rates, terms, and conditions for interconnection.  If the parties do not reach voluntary agreement on all issues within that period, either party may seek "compulsory arbitration," an expedited administrative proceeding to resolve disputed issues of fact and law, which may be conducted by the state regulatory commission.  47 U.S.C. § 252(b).  When performing arbitrations, the state commission must ensure that the arbitrated terms of interconnection comply with the requirements of Sections 251 and 252(d) of the Act and the FCC's implementing regulations.  47 U.S.C. § 252(c).

23.          23.    A proposed interconnection agreement, whether developed through voluntary negotiations alone or through arbitration, must be submitted for review to the appropriate state commission pursuant to Section 252(e).  The state commission then may review the agreement and resolve any disputed issues in compliance with the requirements of Sections 251 and 252(d) of the Act and applicable FCC regulations.  47 U.S.C. § 252(e)(2)(B).

24.          24.    The 1996 Act provides for federal district court review of interconnection agreements that have been approved by a state commission.  As part of this review, federal courts are required to "determine whether the agreement . . . meets the requirements" of Sections 251 and 252.  Because arbitrated terms that are inconsistent with the FCC's implementing regulations also violate the Act, 47 U.S.C. § 252(c), (e)(2)(B), the federal court's mandate under Section 252(e)(6) includes review of agreements for compliance with FCC regulations.

**The ~~WorldCom~~MCI-Verizon Arbitration and Approval Proceedings**

25.          25.    After negotiating with Verizon regarding the terms of interconnection, ~~WorldCom~~MCI filed a petition with the Commission for compulsory arbitration of unresolved issues, pursuant to Section 252(b) of the Act, on August 27, 1996.  The issues presented for arbitration included, among others, the ~~UNEs that Verizon would be required to lease to WorldCom on an unbundled basis, the~~ rates at which Verizon would be required to lease ~~those UNEs to WorldCom, and the points in Verizon's network at which WorldCom would be permitted and/or required to interconnect for the exchange of local telephone traffic~~UNEs to MCI on an unbundled basis.

26.          26.    Prior to the filing of ~~WorldCom~~MCI's petition, the Commission had opened a docket for the resolution of a number of arbitration proceedings that had been instituted by other new entrants, as well as Verizon, in the wake of the passage of the 1996 Act. By order of the Commission, ~~WorldCom~~MCI was granted party status in the pending docket, and legislative-style hearings before the Commission were scheduled for October 7-11, 1996. In the Matter of the Petitions for Approval of Agreements and Arbitration of Unresolved Issues Arising Under Section 252 of the Telecommunications Act of 1996, PSC Case No. 8731, Order No. 72824 (rel. Aug. 12, 1996).[3] In advance of the scheduled hearings, Verizon offered a proposed cost model for the Commission to use in setting the rates at which Verizon would be required to lease its UNEs to the various new entrants. The new entrants, including ~~WorldCom~~MCI, proposed the use of a competing cost model, known as the Hatfield Model.

27.          27.    On September 26, 1996, before the scheduled hearings, the Commission entered an order in which it accepted the parties' statements that Verizon's cost model did not comply with the FCC's mandated TELRIC methodology, and granted the motion of TCG Maryland, a competing carrier, to exclude Verizon's cost model from the Commission's consideration. See PSC Order No. 73010, at 3 (rel. Nov. 8, 1996). The Commission further concluded that consideration of the Hatfield Model would be postponed until sometime after the scheduled October hearings in which the Commission would set interim UNE rates and resolve any other issues that did not depend on the selection and use of a particular cost model.

28.          28.    At the October hearings, representatives of all parties interested in the various issue appeared as joint panelists. Each panelist was given an

---

3/        Unless specified otherwise, all Commission orders identified herein were issued in Case

opportunity to comment and answer questions posed by the Commissioners.  At the conclusion

of the hearings, the parties were directed to submit final comments to the Commission by

October 22, 1996.   Verizon, MFS Intelenet and the Commission staff each submitted proposals

for the establishment of interim UNE rates.   ~~WorldCom~~MCI and AT&T supported the proposal

proffered by the Commission staff.

29.           ~~29.~~   On November 8, 1996, the Commission issued an

order in which it adopted, with one modification, the interim UNE rate proposal offered by

Verizon.  PSC Order No. 73010, at 9-10 (rel. Nov. 8, 1996).  ~~As part of that same order, the~~

~~Commission rejected WorldCom's proposal that Verizon be required to provide~~

~~nondiscriminatory unbundled access to the UNEs known as subloops and dark fiber.[4]  Id. at 13-~~

~~14, 25-26.  Finally~~In addition, the Commission instituted "Phase II" of Case No. 8731 for the

purpose of reviewing the cost models offered by the parties and setting permanent UNE rates.

Id. at ~~39.  In a subsequent order on January 28, 1997, the Commission denied reconsideration of~~

~~its decision not to require the unbundling of dark fiber.  PSC Order No. 73198, at 3, 11 (rel. Jan.~~

~~28, 1997).[5]~~39.[5]

30.           ~~30.~~   On September 22, 1997, the Commission issued the

first of its orders in the Phase II proceedings.  There, the Commission concluded that neither the

_____

No. 8731.

~~4/       The Commission noted, however, that "we do not foreclose that technological~~
~~advancements and other developments may promote the appropriateness of [subloop] unbundling~~
~~at some time in the future, and would expect this to occur on a case-by-case basis."  Id. at 14.~~

~~5/       In the order of January 28, 1997, the PSC further established an interim rate for 4-wire~~
~~loops.  PSC Order No. 73198, at 10.~~

5/       In the order of January 28, 1997, the PSC further established an interim rate for 4-wire
loops.  PSC Order No. 73198, at 10.

Verizon cost model nor the Hatfield Model, jointly sponsored by ~~WorldCom~~MCI and AT&T, would be adopted as the sole methodology for determining permanent UNE rates.  PSC Order No. 73707 (rel. Sept. 22. 1997).   Instead, the Commission determined various inputs to be used in the competing models and directed the parties to file proposed UNE rates using the Commission-determined inputs.  Id.   Thereafter, on October 22, 1997, the parties submitted two separate compliance filings.  One, submitted by Verizon, used the Commission-determined inputs run on the Verizon cost model.  The other, submitted jointly by ~~WorldCom~~MCI and AT&T, used the Commission-determined inputs run on the Hatfield Model.  Although the inputs used in both filings were essentially the same, each used a different overhead input (also known as a common cost factor), as that input had not been predetermined by the Commission.

31.    ~~31.~~    Upon review of the competing compliance filings, the Commission first denied Verizon's June 8, 1998 motion to exclude the Hatfield Model from the Commission's consideration.  PSC Order No. 74365, at 5 (rel. July 2, 1998).  Nevertheless, the Commission affirmed its earlier determination not to rely on either proposed cost model as the sole methodology for determining UNE rates.  Instead, the Commission set recurring UNE rates based on the Commission-determined inputs and a melding of the two competing cost models offered by the parties.

32.    At the same time that the Commission was conducting the Phase II proceedings, which focused on the establishment of UNE rates, the Commission was also holding hearings on the non-pricing issues in the MCI-Verizon arbitration.

33.    ~~32.~~    ~~At the same time that the Commission was conducting the Phase II proceedings, which focused on the establishment of UNE rates, the Commission was also holding hearings on the non-pricing issues in the WorldCom-Verizon~~

~~arbitration.~~ Those proceedings were known as "Phase (b)." The Phase (b) hearings were held on July 15, 1997 before a Hearing Examiner appointed by the Commission to resolve all outstanding issues in the ~~WorldCom~~MCI-Verizon arbitration. The Hearing Examiner issued a proposed order on July 31, 1997, which both parties appealed to the Commission. ~~On appeal, the Commission, among other things, affirmed the proposed order's requirement that WorldCom establish at least one point of interconnection in each of Verizon's access tandem serving areas. PSC Order No. 73725 (filed Oct. 9, 1997).~~

34.    ~~33.~~ On February 10, 2000, the Commission resolved the final outstanding issue in the ~~WorldCom~~MCI-Verizon arbitration and ordered the parties to file for approval a joint Interconnection Agreement incorporating the terms arbitrated by the Commission. On March 22, 2000, the Commission preliminarily approved the Interconnection Agreement filed by ~~WorldCom~~MCI and Verizon, and called for the filing of final comments by April 22, 2000. Thereafter, the Commission affirmed its preliminary assessment and approved as final the Interconnection Agreement arbitrated between ~~WorldCom~~MCI and Verizon on April 24, 2000.

**The Commission's Subsequent UNE Rate-Setting Proceedings**

35.    On January 19, 2001, the Commission issued an order closing the Phase II proceedings, and opening a new docket to reexamine and establish permanent UNE rates in Maryland. In re the Petitions for Approval of Agreements and Arbitration of Unresolved Issues Arising Under Section 252 to the Telecommunications Act of 1996, In re the Investigation Into Recurring Rates for Unbundled Network Elements Pursuant to the Telecommunications Act of 1996, Nos. 8731, 8879 (Md. Pub. Serv. Comm'n Jan. 19, 2001). That order directed the parties to update and modify the cost studies, models, and rates relied upon in the Phase II proceedings,

and to address the impact of intervening regulatory orders and judicial decisions concerning rates for UNEs.  Id. at 3-4.

36.    The Commission issued its final decision in Docket No. 8879 on June 30, 2003.  In re the Investigation Into Recurring Rates for Unbundled Network Elements Pursuant to the Telecommunications Act of 1996, No. 8879 (Md. Pub. Serv. Comm'n June 30, 2003) ("Final UNE Order").  The Commission purported to recognize that the FCC's TELRIC rules were "the appropriate methodology upon which to base UNE prices," and required it to adopt UNE rates that reflect the forward-looking cost of providing the UNEs using an efficient network.  Id. at 13. However, the Commission rejected the TELRIC-compliant Modified Synthesis cost model proposed by AT&T and MCI,  and instead adopted Verizon's unlawful cost models to set UNE rates.  Id. at 15-18.   The Commission also concluded, inter alia, that: (1) the cost studies used to set rates for UNEs should be based on the assumption that 50% of the Digital Loop Carrier ("DLC") would be GR303 Integrated Digital Loop Carrier ("IDLC") with the remaining 50% being Universal Digital Loop Carrier, id. at 43-46; (2) Verizon's two-tiered switching rate design based on minutes of use ("MOU") should be adopted instead of the flat rate switching design proposed by MCI, id. at 54-65; (3) Verizon's model for non-recurring costs ("NRCs") associated with performing "hotcuts" (the procedures necessary for Verizon to transfer a retail customer to a CLEC) should be adopted, id. at 96-97.  At least one party has moved for reinstatement of the rates set in the Phase II proceedings.

## COUNT ONE
### (Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)
### (UNE Rates)

37.    ~~34.    WorldCom~~MCI realleges herein the allegations in paragraphs 1 through ~~33~~36 above.

38.    35.    Sections 251(c)(2), 251(c)(3), and 252(d)(1) of the 1996 Act require that rates for interconnection and unbundled network elements be "just, reasonable, and nondiscriminatory" and "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and . . . may include a reasonable profit."

39.    36.    A long-run forward-looking cost method is necessary to satisfy the Act's requirement that rates be based on cost "without reference to" a rate-based, rate-of-return proceeding.  A pricing methodology that uses "embedded" or historical costs violates the Act and FCC implementing regulations because it compensates the incumbent with a rate of return on its past investments.  By contrast, forward-looking costs approximate the results that would be obtained in a competitive market and therefore prevent incumbent local telephone companies from using interconnection and unbundled element pricing as a means of obstructing competitive entry into the local telecommunications market.

40.    37.    Thus, binding FCC regulations require UNE rates to be set pursuant to the FCC's long-run, forward-looking cost methodology, 47 U.S.C. §§ 51.501(a)-(b), 51.503, 51.505.[6]

41.    38.    During the cost proceedings, in Docket No. 8731, Verizon submitted a cost study that does not meet the Act's requirements and the FCC's regulations because, among other defects, it relies in part on embedded costs and other inflated, unjustified cost factors.

42.    39.    During the cost proceedings, WorldCom in Docket No. 8731, MCI and AT&T Corporation submitted a long-run, forward-looking cost study called

_____

6/    Count One does not rely upon subsection 47 U.S.C. § 51.505(b)(1).

the Hatfield Model, which is consistent with the FCC's methodology. The Hatfield Model was the only cost study evidence before the Commission that met the requirements of the Act and the FCC's implementing regulations.

43. ~~40.~~ The Commission, however, declined to apply the Hatfield Model but instead purported to adopt a "melding" of the Verizon and Hatfield models. In adopting actual loop rates, the Commission used a weighted average of the rates produced by the Verizon and Hatfield models, weighting by approximately 60% the rates produced by Verizon's model and weighting by approximately 40% the rates produced by the Hatfield Model.

44. ~~41.~~ The UNE rates set by the Commission and incorporated into the arbitrated ~~WorldCom~~MCI-Verizon Interconnection Agreement are arbitrary and capricious and otherwise contrary to law because they (i) are not based on the long-run, forward-looking cost methodology as required by the Act and the FCC's binding regulations; (ii) rely on embedded costs in violation of the Act and the FCC's implementing regulations; (iii) are based on the Commission's "melding" of Verizon's and ~~WorldCom~~MCI's proposed loop rates using a weighted average of approximately 60% / 40%, respectively; and (iv) are based on inputs, including but not limited to the common cost overhead factor, that were arbitrarily and capriciously determined by the Commission and manipulated by Verizon.

45. ~~42.~~ ~~WorldCom~~MCI has been aggrieved by the Commission's pricing determinations as set forth above and is entitled to declaratory and other equitable relief pursuant to 28 U.S.C. §§ 2201, 2202 and 47 U.S.C. § 252(e)(6).

**COUNT TWO**
**(Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)**
**(UNE Rates / Efficient Network Configuration)**

46.      43.   WorldComMCI realleges herein the allegations in paragraphs 1 through 3345 above.

47.      44.   Sections 251(c)(2), 251(c)(3), and 252(d)(1) of the 1996 Act require that rates for interconnection and unbundled network elements be "just, reasonable, and nondiscriminatory" and "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and . . . may include a reasonable profit."

48.      45.   A long-run forward-looking cost method based on the use of the most efficient technology currently available and the lowest cost network configuration is necessary to satisfy the Act's requirement that rates be based on cost "without reference to" a rate-based, rate-of-return proceeding.  A pricing methodology that uses existing technology or physical architecture employed by the incumbent carrier violates the Act because it compensates the incumbent with a rate of return on its past investments.

49.      46.   Thus, binding FCC regulations require UNE rates to be set based on the use of the most efficient technology currently available and the lowest cost network configuration, given the existing location of the incumbent local exchange carrier's wire centers.  47 U.S.C. § 51.505(b)(1).

50.      47.   The UNE rates set by the Commission in Docket No. 8731 and incorporated into the arbitrated WorldComMCI-Verizon Interconnection Agreement are arbitrary and capricious and otherwise contrary to law because they are not based on the use of the most efficient technology currently available and the lowest cost network configuration, given the existing location of Verizon's wire centers, in violation of the Act and the FCC's implementing regulations.

51.    ~~48.~~    ~~WorldCom~~MCI has been aggrieved by the Commission's pricing determinations as set forth above and is entitled to declaratory and other equitable relief pursuant to 28 U.S.C. §§ 2201, 2202 and 47 U.S.C. § 252(e)(6).

**COUNT THREE**
**(Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)**
~~(Subloops)~~
**(Adoption of Verizon's Cost Model)**

52.    ~~49.~~    ~~WorldCom~~MCI realleges herein the allegations in paragraphs 1 through ~~33~~51 above.

~~50.    A network element is defined in Section 3(45) of the Act, 47 U.S.C. § 153(45) as "a facility or equipment used in the provision of a telecommunications service."~~

~~51.    Section 251(c)(3) of the Act requires Verizon to provide nondiscriminatory access to its network elements "on an unbundled basis at any technically feasible point" on rates, terms, and conditions that are just, reasonable, and nondiscriminatory. In addition, the statute requires the determination of whether "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).~~

~~52.    Pursuant to these standards, binding FCC regulations require incumbent carriers, such as Verizon, to provide new entrants, such as WorldCom, with unbundled access to the network element known as subloops. 47 C.F.R. § 51.319(a) (1999).~~

~~53.    Subloops are the constituent components of the local loop—the core of any incumbent's local telephone network. Allowing new entrants to lease subloops as an unbundled element gives new entrants the flexibility to route their customers' calls to their own facilities at various points in the network. The failure to allow new entrants to lease subloops as~~

a separate network element would require the duplication of the existing local network and impair the ability of WorldCom to provide the service it seeks to offer.

54.     WorldCom requested that the Commission permit it to purchase subloops as a separate unbundled network element.  The Commission made no finding that subloops are not a network element but, nevertheless, ordered that Verizon is not required to provide WorldCom with unbundled access to its subloops.

55.     The Commission's order and the resulting Interconnection Agreement thus violate Section 251(c)(3) of the Act, the FCC's UNE Remand Order and 47 C.F.R. § 51.319(a) (1999).

53.     Section 252(d)(1) of the 1996 Act requires incumbent carriers to provide UNEs at cost-based rates determined "without reference to a rate-of-return or other rate-based proceeding."  47 U.S.C. § 252(d)(1).

54.     The FCC regulations that implement section 252(d)(1) require the MPSC to set UNE rates in accordance with the FCC's TELRIC methodology.  47 C.F.R. § 51.503. TELRIC-compliant rates reflect the forward-looking cost of providing the UNE using "the most efficient telecommunications technology currently available and the lowest cost network configuration."  Id. § 51.505(b)(1).

55.     The Commission's adoption of Verizon's cost model in the Final UNE Order violates the FCC's mandated TELRIC pricing methodology and the 1996 Act because, among other failings, that model is based on Verizon's existing network, rather than a network designed with the most efficient technology and lowest cost network configuration.  That decision is also arbitrary and capricious, not supported by the evidence, and otherwise contrary to law.

56.             56.     WorldComMCI has been aggrieved by the
Commission's determinationsadoption of Verizon's cost model as set forth above and is entitled
to declaratory and other equitableinjunctive relief pursuant to 28 U.S.C. §§ 2201, 22022202, and
47 U.S.C. § 252(e)(6).

**<u>COUNT FOUR</u>**
**(Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)**
**(Dark Fiber)**

**(GR303)**

57.             57.     WorldComMCI repeats and realleges herein the
allegations in paragraphs 1 through 3356 above as if fully set forth herein.

58.     A network element is defined in Section 3(45), 47 U.S.C. § 153(45) as "a
facility or equipment used in the provision of a telecommunications service."

59.     Section 251(c)(3) of the Act requires Verizon to provide
nondiscriminatory access to its network elements "on an unbundled basis at any technically
feasible point" on rates, terms, and conditions that are just, reasonable, and nondiscriminatory.
In addition, the statute requires the determination of whether "the failure to provide access to
such network elements would impair the ability of the telecommunications carrier seeking access
to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).

60.     Pursuant to these standards, binding FCC regulations require incumbent
carriers, such as Verizon, to provide new entrants, such as WorldCom, with unbundled access to
the network element known as dark fiber. 47 C.F.R. § 51.319(a) (1999).

61.     Dark fiber is fiber optic transmission cable that is currently nonoperational
because it does not yet have the associated electronic equipment needed to transmit
telecommunications. It is located where operation is expected or anticipated. When dark fiber is

"activated" by combining it with other telecommunications equipment at both ends, it is used to transmit telecommunications.  Thus, dark fiber meets the Act's definition of a network element because it is "equipment used in the provision of a telecommunications service."

62.    WorldCom will be impaired in providing the services it seeks to offer if dark fiber is not unbundled.  Without this network element, WorldCom must either undertake expensive construction efforts to place its own fiber or be limited to purchasing the use of "lit" (fiber optic cable with electronics) transport services only after deployment by Verizon. Accordingly, the unavailability of dark fiber to new local telephone entrants will diminish competition and increase prices to consumers.  Permitting incumbent local telephone companies to withhold dark fiber from their competitors, where unbundled access is clearly technically feasible, will advantage monopoly providers and undermine competition for the most technologically advanced local telecommunications services, in contradiction of the purposes of the Act's unbundling requirements.

63.    WorldCom requested that the Commission permit it to purchase dark fiber as a separate unbundled network element.  The Commission made no finding that dark fiber is not a network element but, nonetheless, ordered that Verizon is not required to provide WorldCom with unbundled access to dark fiber.

64.    The Commission's order and the resulting Interconnection Agreement thus violate Section 251(c)(3) of the Act, the FCC's UNE Remand Order and 47 C.F.R. § 51.319(a) (1999).

58.    Section 252(d)(1) of the 1996 Act requires incumbent carriers to provide UNEs at cost-based rates determined "without reference to a rate-of-return or other rate-based proceeding."  47 U.S.C. § 252(d)(1).

59.    The FCC regulations that implement section 252(d)(1) require the Commission to set UNE rates in accordance with FCC's TELRIC methodology.  47 C.F.R. § 51.503.  TELRIC-compliant rates reflect the forward-looking cost of providing the UNE using "the most efficient telecommunications technology currently available and the lowest cost network configuration."  Id. § 51.505(b)(1).

60.    One UNE to which MCI is entitled at TELRIC rates is the basic "loop" or phone line that connects a customer's premises to Verizon's network.  Loop cable may be either copper or fiber.  Digital Loop Carrier ("DLC") is a form of loop cable that uses fiber cable to digitally encode and combine (multiplex) subscriber loop channels into signals that provide more efficient transmission or extended range than copper cable.  Specifically, DLC converts analog signals to digital signals, combines them with other signals, and then transports them to the local exchange carrier's central office.

61.    An efficient forward-looking network, as required under the FCC's regulations, would consist of 100% DLC technology using an advanced technology known as the "GR303" interface.  The evidence in the record demonstrated that GR303 DLC is the least cost, most efficient technology available today.  However, the Commission concluded that only 50% of the loop plant in Verizon's network would be DLC, and that the remaining 50% would be inefficient end-to-end copper loops.

62.    The Commission's adoption of a 50% DLC/GR303 assumption in the Final UNE Order violates the FCC's mandated TELRIC methodology and the 1996 Act, is arbitrary and capricious, unsupported by the evidence, and otherwise contrary to law.

63.    ~~65.    WorldCom~~MCI has been aggrieved by the Commission's ~~determinations~~adoption of a 50% GR303 assumption as set forth above and is

entitled to declaratory and ~~other equitable~~injunctive relief pursuant to 28 U.S.C. §§ 2201, ~~2202~~2202, and 47 U.S.C. § 252(e)(6).



**COUNT FIVE**
**(Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)**
~~(Points of Interconnection)~~
**(Switching Rate Design)**

64.    ~~66.~~    ~~WorldCom~~MCI repeats and realleges ~~herein the allegations in~~ paragraphs 1 through ~~33~~63 above as if fully set forth herein.

~~67.    Section 251(c)(2) of the Act requires that an incumbent local exchange carrier interconnect with a new entrant "at any technically feasible point within the carrier's network," 47 U.S.C. § 252(c)(2)(B), and on terms that are just, reasonable, and nondiscriminatory, 47 U.S.C. § 252(c)(2)(D).~~

~~68.    Implementing the mandate of Section 251(c)(2), paragraphs 210 and 212 of the FCC's binding Local Competition Order set forth the minimally required points of interconnection between the incumbent local exchange carrier and the new entrant.  The Local Competition Order further makes clear that it is up to the new entrant to determine, for itself, the points at which it will interconnect with the incumbent's network.  Local Competition Order ¶ 205.  If an incumbent refuses to provide interconnection at the points requested by a new entrant, it must prove that interconnection at those points is not technically feasible.  Id.~~

~~69.    During the arbitration proceeding, WorldCom proposed to interconnect with Verizon at only one point per local access and transport area ("LATA").  As adopted by the Commission, however, the Interconnection Agreement requires WorldCom to interconnect with Verizon's network in each of Verizon's access tandem serving areas.[7]  The arbitrated terms of the Interconnection Agreement thus unlawfully force WorldCom to interconnect at potentially~~

inefficient points on Verizon's network where WorldCom might otherwise not choose to interconnect.

70.    Verizon did not prove to the Commission that it would be technically infeasible for WorldCom to interconnect at fewer points in Verizon's network, as WorldCom requested.

71.    Because the arbitrated Interconnection Agreement does not permit WorldCom to select the points at which it will interconnect with Verizon's network, but requires WorldCom to interconnect at points within every access tandem serving area – and to pay for such interconnection – the Agreement is discriminatory and imposes unjust and unreasonable conditions on interconnection in violation of Section 251(c)(2) of the 1996 Act and the FCC's binding Local Competition Order.

65.    Section 252(d)(1) of the 1996 Act requires incumbent carriers to provide UNEs at cost-based rates determined "without reference to a rate-of-return or other rate-based proceeding."  47 U.S.C. § 252(d)(1).

66.    The FCC regulations that implement section 252(d)(1) require the Commission to set UNE rates in accordance with FCC's TELRIC methodology.  47 C.F.R. § 51.503.  TELRIC-compliant rates reflect the forward-looking cost of providing the UNE using "the most efficient telecommunications technology currently available and the lowest cost network configuration."  Id. § 51.505(b)(1).

67.    In addition, the Act and the FCC's regulations entitle requesting carriers such as MCI to nondiscriminatory access to an incumbent's unbundled network elements on the

_____

7/    An access tandem serving area is the area served by a Verizon access tandem switch.

same terms and conditions as the incumbent provides to itself.  See 47 U.S.C. § 251(c)(3); 47 C.F.R. §§ 51.311, 51.313.

68.     In the Final UNE Order proceedings,  MCI presented evidence that Verizon's proposed two-tier rate for unbundled access to Verizon's switches, which determined costs by reference to minutes-of-use ("MOU"), did not properly reflect the costs incurred by an efficient forward-looking network.  MCI also demonstrated that Verizon's switching rate design does not reflect Verizon's own costs because Verizon does not incur a "per MOU" cost in its switch vendor contracts, and Verizon's costs therefore do not vary on a per MOU basis. Adoption of a flat rate switching design was thus necessary to comply with the requirements of the 1996 Act and the FCC's implementing regulations and orders mandating nondiscriminatory, cost-based access to Verizon's unbundled network elements.

69.     The Commission nonetheless adopted Verizon's two-tier switching rate design, and declined to adopt a flat rate switching design.

70.     The Commission's adoption of a two-tiered switching rate based on MOU violates the 1996 Act and the FCC's implementing regulations and orders, is arbitrary and capricious, unsupported by the evidence, and otherwise contrary to law.

71.     MCI has been aggrieved by the Commission's failure to adopt a flat rate switching design as set forth above, and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 47 U.S.C. § 252(e)(6).

**COUNT SIX**
**(Violation of the 1996 Act and the Implementing FCC Orders, Rules and Regulations)**
**(NRCs)**

72.     MCI repeats and realleges paragraphs 1 through 71 above as if fully set forth herein.

73. Section 252(d)(1) of the 1996 Act requires incumbent carriers to provide UNEs at cost-based rates determined "without reference to a rate-of-return or other rate-based proceeding." 47 U.S.C. § 252(d)(1).

74. The FCC regulations that implement section 252(d)(1) require the Commission to set UNE rates in accordance with FCC's TELRIC methodology. 47 C.F.R. § 51.503. TELRIC-compliant rates reflect the forward-looking cost of providing the UNE using "the most efficient telecommunications technology currently available and the lowest cost network configuration." Id. § 51.505(b)(1).

75. The non-recurring cost[1] ("NRC") model Verizon submitted to the Commission in the Final UNE Order proceedings was based on backward-looking embedded network assumptions, incorrect economic concepts, and faulty survey data. As a result of these and other flaws, Verizon's model for determining the NRCs associated with performing "hot cuts"[2] is inconsistent with a forward looking cost analysis.

76. However, the Commission adopted Verizon's unlawful NRC model for hot cuts. Final UNE Order at 96-97.

77. The Commission's adoption of Verizon's NRC model for hot cuts violates the 1996 Act and the FCC's implementing regulations and orders, is arbitrary and capricious, unsupported by the evidence, and otherwise contrary to law.

78. 72. WorldComMCI has been aggrieved by the Commission's determinationsadoption of Verizon's NRC model as set forth above, and is

---

[1] Non recurring costs are one-time costs that incumbent carriers like Verizon experience when a service is established, connected or changed, and/or when they lease their networks to new entrants like MCI.

[2] "Hot cuts" are the procedures necessary for Verizon to transfer a retail customer to a CLEC.

entitled to declaratory and ~~other equitable~~ injunctive relief pursuant to 28 U.S.C. §§ 2201,

~~2202~~ 2202, and 47 U.S.C. § 252(e)(6).

**PRAYER FOR RELIEF**

WHEREFORE, ~~WorldCom~~ MCI requests that this Court grant it the following relief:

(a)     That the Court declare that the challenged provisions of the ~~WorldCom~~ MCI-

Verizon

Interconnection Agreement and the Commission's ~~decisions:~~

> (i)     ~~failing to set forward-looking, cost-based UNE rates in accordance with the mandated long-run, forward-looking cost methodology;~~
>
> (ii)    ~~failing to require Verizon to provide WorldCom with unbundled access to its subloops;~~
>
> (iii)   ~~failing to require Verizon to provide WorldCom with unbundled access to dark fiber; and~~
>
> (iv)    ~~failing to require Verizon to permit WorldCom to interconnect with Verizon's network at only one point per LATA at WorldCom's option where technically feasible~~ various pricing orders violate the 1996 Act

and the FCC's implementing orders and regulations~~;~~.

(b)     That the Court ~~reform~~ remand the Interconnection Agreement ~~or order its reformation~~ and relevant orders to the MPSC with instructions for the MPSC to reform its orders and the parties' Interconnection Agreement consistent with the Act, the FCC's implementing

orders and regulations, and the decision of this Court; and

(c)     That the Court award ~~WorldCom~~ MCI such other and further relief as the Court deems just and proper.

Respectfully submitted,

MCI WORLDCOM NETWORK SERVICES, INC.
and MCIMETRO ACCESS TRANSMISSION
SERVICES LLC

_____

~~Matthew B. Pachman~~                              ~~Jodie L. Kelley (No. 22178)~~

Jeffrey A. Rackow  (No. 14858)                     Michael B. DeSanctis (No. 15043)

~~WorldCom, Inc.~~                                      ~~JENNER & BLOCK~~

MCI                                                Robin M. Meriweather

1133 19th Street, N.W.                             ~~601 13th Street, N.W.~~ JENNER & BLOCK, LLC

Washington, D.C.  20036  601 13th Street, N.W.

Telephone:  (202) 736-6933                         Washington, D.C.  20005

~~Telephone~~Facsimile:  (202) 736-~~6933~~6072              Telephone:  (202) 639-6000

~~Facsimile:  (202) 736-6072~~                         Facsimile:  (202) 639-6066

Counsel for ~~Plaintiffs~~MCI

Dated: ~~September 20, 2000~~October 17, 2003

31

Document comparison done by DeltaView on Friday, October 17, 2003 5:59:29 PM

| Input: | |
|---|---|
| Document 1 | file://L:/MERIWERM/252/Maryland/first amended complaint.doc |
| Document 2 | file://L:/MERIWERM/252/Maryland/second amended complaint final.doc |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 154 |
| Deletions | 141 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 309 |