IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MCI WORLDCOM NETWORK<br>SERVICES, ET AL. | )<br>)<br>) | |
| PLAINTIFFS | )<br>) | CIVIL ACTION NO.<br>AMD 00-CV-1518 |
| V. | )<br>) | |
| VERIZON MARYLAND, INC.,<br>THE MARYLAND PUBLIC<br>SERVICE COMMISSION, KENNETH D.<br>SCHISLER,  J. JOSEPH CURRAN, III,<br>GAIL C. MCDONALD, RONALD A.<br>GUNS, AND HAROLD D. WILLIAMS | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| DEFENDANTS | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS**

**I.     INTRODUCTION**

Plaintiffs MCI WorldCom Network Services, Inc. and MCI Metro Access Transmission Services, LLC ("MCI"), in their Second Amended Complaint, seek a declaratory judgment that the decisions of the Maryland Public Service Commission ("Commission" or "PSC") rendered in Case No. 8731 and Case No. 8879[1] violate the Telecommunications Act of 1996, 47 U.S.C. § 251 *et. seq.* ("1996 Act").  Specifically, MCI contends that the unbundled network element ("UNE") rates previously adopted by the Commission in Case No. 8731 violate the allegedly mandated methodology (Count One); that the UNE rates previously adopted in Case No. 8731 violate the 1996 Act because they are not based on the use of the most efficient technology currently available and the lowest cost network configuration (Count Two); that the Commission's adoption of Verizon Maryland Inc's ("Verizon") cost model in

---

[1] *In the Matter of the Investigation into Rates for Unbundled Network Elemenets Pursuant to the Telecommunications Act of 1996,* Case. No. 8879, Order No. 78552 (June 30, 2003).  (" *UNE Order*")

Case No. 8879 violates the 1996 Act (Count Three); that the Commission's adoption of a 50% Digital Loop Carrier ("DLC")/"GR303" interface in Case No. 8879 violates the 1996 Act (Count Four); that the Commission's adoption of a two-tier switching rate design in Case No. 8879 violates the 1996 Act (Count Five); and finally that the Commission's adoption of Verizon's non-recurring cost ("NRC") model for "hot cuts"[2] in Case No. 8879 violates the 1996 Act. (Count Six). MCI requests that the Court order the reformation of the Commission Orders and MCI's interconnection agreement.

As set forth more fully below, Counts Three through Six of MCI's Second Amended Complaint must be dismissed because MCI has failed to exhaust its administrative remedies. MCI fails to inform this Court that it requested rehearing on the very issues raised in this Complaint. (Appendix A) Thus, MCI's claims regarding the *UNE Order* are not ripe for review. MCI must await completion of the administrative process prior to bringing suit. *Stone v. INS*, 514 U.S. 386 (1995).

With regard to Counts One and Two, the Commission's issuance of the *UNE Order* has rendered the previous pricing decision moot. *Maryland Highway Contractors Ass'n. v. Maryland*, 933 F.2d 1246 (4th Cir.) *cert. denied* 502 U.S. 939 (1991). Because all of the Counts raised in the Second Amended Complaint either are not ripe or are moot, MCI's entire Complaint must be dismissed.

**STATEMENT OF FACTS**

**A.     The Telecommunications Act of 1996**

On February 8, 1996, President Clinton signed into law the 1996 Act, which establishes a framework for opening the local telephone markets to competition.[3] In order to promote competition in the local exchange telecommunications market, the 1996 Act imposes a general duty on all

---

[2] "Hot cuts" refers to the procedures Verizon uses to transfer a customer to a competitive local exchange carrier.
[3] *See*, 47 U.S.C. §§ 251-261. The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), is codified throughout Title 47 of the United States Code. References to the 1996 Act are to the relevant sections of the Code.

telecommunications carriers to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers. 47 U.S.C. § 251(a). With regard to incumbent local exchange carriers ("ILECs") such as Verizon, the duty to interconnect is even more specifically defined by § 251(c)(2).

Sections 251 and 252 of the Telecom Act provide the specifics for how competition for the provision of local telephone service is to develop. In Section 251, Congress created the obligation for incumbent local exchange carriers ("ILECs") to allow their competitors, competitive local exchange carriers ("CLECs"), to interconnect with their network so that they may use those facilities to provide competing local telephone service. *See,* 47 U.S.C. § 251. Section 251 requires ILECs to provide such interconnection that is at least equal in quality to that provided by the ILEC to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection at rates, terms and conditions that are just, reasonable and nondiscriminatory. 47 U.S.C. § 251(c)(2). Congress also requires ILECs to provide such access to individual network elements[4] on an unbundled basis, called UNEs (unbundled network elements), at rates, terms and conditions that are just, reasonable and nondiscriminatory so that a CLEC can combine such UNEs in order to provide a competing telecommunications service. 47 U.S.C. § 251(c)(3).

The procedures for negotiations between Competitive Local Exchange Carriers ("CLECs") and ILECs are governed by § 252 of the Act. If negotiating companies cannot reach agreement, § 252 provides that the parties may request that the appropriate State commission arbitrate unresolved issues.

---

[4] Network elements include all facilities or equipment used to provide telephone service. Facilities and equipment include the hardware required to offer phone service. The most significant hardware consists of the phone lines. Network elements also include "feature, functions, and capabilities" used to provide, among other things, subscriber phone numbers, databases, and billing and collection system. §§ 251(c)(2).

3

Each interconnection agreement[5] must be submitted to the State commission for approval, regardless of whether the agreement was negotiated by the parties or arbitrated, in whole or part, by the State commission. 47 U.S.C. § 252(e)(1). However, the State commission may only reject a negotiated agreement if it finds that the agreement or a portion thereof discriminates against a telecommunications carrier not a party to the agreement, or the implementation of such an agreement is not consistent with the public interest, convenience and necessity. 47 U.S.C. § 252(e)(2)(A).

In Section 252, Congress articulated the procedures for negotiating, arbitrating and approving the interconnection agreements as well as the rates for UNEs. In particular, Section 252 provides that the rates for interconnection of facilities and UNEs as provided for in Section 251 shall be just and reasonable and based on the cost (determined without reference to a rate of return or other rate-based proceeding) of providing the interconnection or network element. 47 U.S.C. § 252(d)(1). This section also provides that the rates shall be nondiscriminatory and may include a reasonable profit.

**B.      Maryland Commission Decisions**

On July 18, 1996, the Commission instituted Case No. 8731 to consider various interconnection agreements and to arbitrate unresolved pursuant to the provisions of § 252 of the 1996 Act. 47 U.S.C. § 252. Order No. 73010 was subsequently entered on November 8, 1996. This Order set interim rates for various elements of interconnection between local exchange carriers and other telecommunication companies. The Commission further determined that a Phase II should be instituted to consider appropriate cost studies utilized in setting permanent interconnection rates.

---

[5] An interconnection agreement is a lengthy commercial contract (often several hundred pages long) that addresses the myriad of technical and economic issues implicated by the new entrant's provision of local telephone service in areas in which an incumbent maintains monopoly control over local service facilities. Among, other things, the agreement defines how, and at what prices, the new entrant may use the incumbent's existing bottleneck facilities and services.

4

By Order No. 73707, entered on September 22, 1997, in Phase II of Case No. 8731, the Commission concluded that none of the cost models presented should be adopted as the sole methodology for determining UNE costs. Instead, the Commission established input values and directed the parties to file proposed costs for UNEs using these inputs.

Both Bell Atlantic-Maryland, Inc.[6] and MCI (joint with AT&T Communications of Maryland, Inc. ("AT&T")) filed cost studies using the previously set input values MCI/AT&T proffered the "Hatfield Model". The Commission expressed skepticism that either model could be properly adopted as the sole model on which to determine the appropriate costs for UNEs. The Commission therefore determined that a combination of the two models should be used to set rates for loops, switching and other UNEs.

On July 31, 1998, MCI filed a Motion for Rehearing. Essentially, MCI claimed that the charges adopted by the Commission were too high. Specifically, MCI objected to the rates for unbundled loops, unbundled switching, call termination and the common overhead factor.

BA-MD also filed a request for rehearing. In contrast to MCI's petition, BA-MD claimed that the charges set by the Commission were too low. WorldCom[7] also filed a request for rehearing, arguing that the Commission should adopt only one rate for unbundled switching and end office transport and termination.

On September 5, 2000, MCI renewed its request for reconsideration of the loop and switching rates. MCI stated that the passage of time has accentuated the need to re-examine the UNE rates established in Maryland. By Order No. 76694, issued January 19, 2001, the Commission granted MCI's

---

[6] Subsequent to the start of Case No. 8731, Bell Atlantic-Maryland Inc. changed its name to Verizon Maryland, Inc.
[7] At the time of this filing, WorldCom and MCI were two separate companies.

5

request to re-examine the UNE rates. The Commission specifically stated that it was not instituting such a proceeding from scratch but that parties should refresh the cost studies, models and rates previously relied upon and should address the effect of any judicial and regulatory orders. This proceeding was redocketed as Case No. 8879.

On June 30, 2003, the Commission issued Order No. 78552 in Case No. 8879. Through this Order the Commission replaced the UNE rates established in Case No. 8731. Furthermore, rather than combine two cost models, the Commission adopted Verizon's new cost model with changes to other various inputs.

On July 31, 2003, MCI filed a Petition for Reconsideration and Request for Clarification (Appendix A).[8] The Commission also received Petitions for Reconsideration from Verizon and AT&T. On September 9, 2003, the Commission directed the parties to Case No. 8879 to respond to the Petitions by October 8, 2003. On October 7, 2003, MCI requests that the time for filing replies be extended until October 22, 2003. Also on October 7, 2003, the Commission granted this request.

## ARGUMENT

A. **COUNTS THREE THROUGH SIX OF MCI'S SECOND AMENDED COMPLAINT MUST BE DISMISSED BECAUSE MCI HAS FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES.**

Ripeness law serves two basic purposes. It conserves judicial resources for problems that are real and imminent by prohibiting these resources from being expended on problems that are hypothetical or remote. It also limits the ability of the courts to intrude on the policymaking domains of executive agencies by limiting court review of government actions to only those instances where the government's

---

[8] This Court should note that MCI's Petition for Reconsideration was filed with the Commission almost three months prior to MCI's filing of the Second Amended Complaint.

6

position has crystallized to the point at which a court can identify a relatively discrete dispute. In many contexts, courts refer to the ripeness requirement interchangeably with the exhaustion and finality requirements and in many contexts, it is interchangeable. Generally, exhaustion of administrative remedies should occur before a case will be considered ripe for judicial review. *Placeway Const. Corp. v. U.S.* 920 F.2d 903, 906 (Fed. Cir. 1990).

Ripeness requires a two-fold inquiry evaluating the hardship to the parties of withholding judicial determination and evaluating whether the issues are fit for judicial determination. *Abbot Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). ("*Abbot Labs*") Resolution of the latter question requires the consideration of a variety of factors including whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established. *Aquarella v. Richardson*, 437 F.2d 397, 403-405 (2d Cir. 1971).

The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. See, generally, 3K Davis, *Administrative Law Treatise* § 20.01 et. seq. (1983). The doctrine provides that "no one is entitled to judicial relief for a supposed or threatened injury until the proscribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50-51 (1938). The Supreme Court has long acknowledged the general rule that parties must exhaust prescribed administrative remedies before seeking relief from federal courts. Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promotion judicial efficiency. *McCarthy v. Madigan,* 503 U.S. 140, 144 (1992). Agencies are protected from judicial intrusion into their adjudicative processes and courts are protected from needlessly expending resources on cases which are more properly within the province of an administrative agency. *Abbott Labs,* 387 U.S. at 148-49. Premature review "denies the agency an opportunity to correct its own mistakes and to apply its expertise." *Ohio Forestry Ass'n. v. Sierra Club,* 523 U.S. 726, 735 (1998).

The exhaustion requirement provides an agency with the opportunity to "correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* at 145. Since agency decisions frequently require expertise, the agency should be given the first chance to apply that expertise, to find facts and exercise its discretion. *McKart v. United States,* 395 U.S. 185, 194 (1969). See, *Toilet Goods Assn'n Inc. v. Gardner,* 387 U.S. 158, 166 (1967). Also, the exhaustion doctrine is required because of practical notions regarding judicial efficiency. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the Court may never have to intervene. *McKart,* 395 U.S. at 195. Judicial review can be hindered by the failure to exhaust administrative remedies because the agency may not have an adequate opportunity to assemble and analyze relevant facts and to explain the basis for its action. *Id.* By vesting the implementation of the 1996 Act in the administrative agencies (State commissions), Congress was aware that exhaustion would be required before a litigant may challenge final agency action in federal court. *Volvo GM v. U.S.*, 118 F.3d 205, 211-212 (4th Cir. 1997).

A variety of courts have dismissed complaints on the basis of petitioners' failure to exhaust administrative remedies. For example, in *Nippon Steel Corp. v. United States*, 219 F.3d 1348 (Fed. Cir. 2000), the Court required a petitioner that sought to enjoin a Commerce Department proceeding as *ultra vires* to exhaust its administrative remedies by participating in that very proceeding. The Court said it would "be most inappropriate for a court to intervene with the ongoing administrative proceedings until Commerce has completed its action." *Id.* at 1355 (citation omitted) The Court noted that the proceeding would "involve exercise of discretionary power given [the agency] by Congress and require application of specialized expertise." *Id.*

The Supreme Court has held that the filing of a motion to reconsider affects ripeness. The Supreme Court stated:

> The timely filing of a motion to reconsider renders the underlying order non-final for purposes of judicial review. In consequence, pendency of reconsideration render the underlying decision not yet final…a party who sought rehearing cannot seek judicial review until the rehearing has concluded. *Stone v. INS*, 514 U.S. 386, 392 (1995). (citations omitted)

Fourth Circuit precedent is clear that a case will not be considered "fit for judicial review" unless "the agency rule or act giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Federal Savings Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir. 1992).

Similarly, the D.C. Circuit held that a rule had not become final when a petition for reconsideration was still pending. *Brotherhood of Railway Carmen Division v. Pena*, 64 F.3d 702 (D.C. Cir. 1995). The D.C. Circuit reached this conclusion despite the fact that the agency's rules required it to act on the petition within four months and the agency had not acted within that time.

When a motion for rehearing is in fact filed, there is no final action until the motion is denied…when a party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary. *Outland v. CAB*, 284 F.2d 224, 227-28 (D.C. Cir. 1960). See, also, *West Penn Power Co. v. EPA,* 860 F2d 581 (3rd Cir. 1988); *Winter v. ICC,* 851 F2d 1056 (8th Cir.), *cert. denied*, 488 U.S. 925 (1988). Thus, it is well established that a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order.

The D.C. Circuit Court dismissed an appeal as unripe under circumstances similar to those presented in this case. In *Moreau v. FERC,* 982 F.2d 556, 567 (D.C. Cir. 1993), the Federal Energy Regulatory ("FERC") granted a pipeline company a certificate of public convenience to construct a pipeline. Adjacent property owners challenged FERC's decision but also moved to vacate a related order and for reconsideration of a different order. *Id.* at 559. The D.C. Circuit found that the FERC

proceedings on those two motions would address some of the same issues as the appeal. The Court found that the appeal "appears to involve complicated and sensitive administrative applications of law and policy to unsettled and ever-shifting factual developments." *Id.* Thus, the D.C. Circuit held that the case would not become ripe until after the agency acted on the motions. *Id.* at 567-68.

The Fourth Circuit has refused to consider an appeal from an administrative agency when there was a even <u>mere possibility</u> that the agency would institute a new proceeding to further consider the matter. *West Virginia Highlands Conservancy v. Babbitt,* 161 F.3d 787 (4th Cir. 1998) ("WVHC"). In *WVHC,* a fuel company that had previously performed mining operations was released from its reclamation bonds by the State of West Virginia. The Office of Surface Mining ("OSM") required the fuel company to reduce acid mine drainage at one of its previous sites. However, the Interior Board of Land Appeals ("IBLA") vacated the order based on West Virginia's earlier release but suggested that OSM reassert jurisdiction under a different statutory provision. A citizens group appealed the IBLA's ruling to the district court and then to the Fourth Circuit. While the appeal was pending in the Fourth Circuit, OSM attempted to reassert jurisdiction as suggested by the IBLA. The Fourth Circuit held that the case was not ripe because of the possibility that OSM would obtain jurisdiction in another proceeding and revisit the issues which were on appeal. See, also, *Mississippi Valley Gas Co. v. FERC,* 68 F.3d 503, 508-509 (D.C. Cir. 1995).

In its Second Amended Complaint, MCI objects to a variety of decisions made by the Commission in Order No. 78552. However, MCI fails to mention that it requested rehearing of these very same decisions and that this request is still pending before the Commission. Thus, MCI is receiving the administrative process **it requested**. MCI's failure to exhaust administrative remedies leaves all of the Counts in the Second Amended Complaint not ripe because the administrative record is incomplete. Furthermore, the fact that WorldCom failed to exhaust an administrative process it

10

voluntarily started is crucial in weighing the hardship to the parties. The Court should find that MCI must complete this process and the Second Amended Complaint.

### B.  COUNTS ONE AND TWO MUST BE DISMISSED AS MOOT.

In its Second Amended Complaint, MCI objects to, among other things, the rates the Commission established for UNEs in Case No. 8731. Succinctly stated, MCI objects to the Commission's decision to "meld" the two competing cost models offered by the parties rather than rely on its proposed cost model as the sole methodology for determining UNE rates.

Specifically, Count One alleges that the UNE rates set by the Commission are arbitrary and capricious and otherwise contrary to law because they:

> (i) are not based on the long-run, forward looking cost methodology required by the 1996 Act and the Federal Communications Commission's ("FCC") regulations;
> (ii) rely on embedded costs in violation of the 1996 Act and the FCC's regulations;
> (iii) are based on the Commission's "melding" of Verizon's and MCI's proposed loop rates; and
> (iv) are based on inputs, including but not limited to the common cost overhead factor, that were arbitrarily and capriciously determined by the Commission and manipulated by Verizon.

Second Amended Complaint, ¶44.

Similarly, in Count Two of the Second Amended Complaint, MCI alleges that the UNE rates set by the Commission in Case No. 8731 are arbitrary and capricious and otherwise contrary to law because they are not based on the use of the most efficient technology currently available and the lowest cost network configuration. Second Amended Complaint ¶50.

As noted previously, on June 30, 2003, the Commission issued Order No. 78552 in Case No. 8879. This Order replaces the UNE rates objected to by MCI. Furthermore, in Order No. 78552, the Commission did not "meld" together two cost studies. Thus, the methodology to which MCI objects is

11

no longer used by the Commission. For the reasons set forth below, Counts One and Two are now moot and must be dismissed by the Court.

In *Maryland Highway Contractors Ass'n v. Maryland,* 933 F.2d 1246 (4th Cir., *cert denied,* 502 U.S. 939 (1991), the Fourth Circuit stated that an action is moot when it has "lost its character as a present live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Id.* at 1249. "Mootness goes to the heart of the Article III jurisdiction of the courts." *Suarey Corp. Indus. v. McGraw,* 125 F.3d 222, 228 (4th Cir. 1997). Finally, the Fourth Circuit has held that "[W]hen circumstances change from the time the suit is filed to the time of appeal, so that the appellate court can no longer serve the intended harm-preventing function or has no effective relief to offer, the controversy is no longer live and must be dismissed as moot." *Friedman's Inc. v. Dunlap,* 290 F.3d 191, 197 (4th Cir. 2002 citations omitted)).

The current case epitomizes the situation described in *Friedman's.* With regard to Counts One and Two, MCI objections are that the Commission "melded" its "Hatfield Model" with Verizon's own cost study model and that this cost methodology violated the 1996 Act and FCC regulations.

Importantly, MCI has abandoned its advocacy of the Hatfield Model as a costing methodology. In Case No. 8879, MCI sponsored the Modified Synthesis Cost Model ("Synthesis Model").[9] Thus, whether the "melding" of the Hatfield Model and Verizon's model was contrary to federal law also is an academic question.

---

[9] *In the Matter of the Investigation into Recurring Rates for Unbundled Network Elements Pursuant to the Telecommunications Act of 1996,* Case No. 8879, Order No. 78552 (June 30, 2003) at pg. 7. *Id.* at pg. 18.

## **CONCLUSION**

For the reasons set forth above, this Court should find that the purposes served by the exhaustion doctrine would be advanced by requiring exhaustion in this context. Thus, the Court should dismiss Counts Three through Six of MCI's Second Amended Complaint. Similarly, the Court should find that Cunts One and Two of MCI" Second Amended Complaint must be dismissed as moot. Therefore, MCI's' entire Second Amended Complaint must be dismissed.

.

    Respectfully submitted,

    _____
    Susan Stevens Miller
    General Counsel
    Maryland Public Service Commission
    6 St. Paul Street, 16th Floor
    Baltimore, Maryland 21202
    (410) 767-8039, Bar No. 006100

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY,** that on this 31st day of October, 2003, a copy of the foregoing Memorandum in Support of the Second Motion to Dismiss of the Maryland Public Service Commission was mailed first class, postage prepaid to the following parties:

Michael DeSanctis, Esq.
Jenner & Block
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C.  20005

James Garland, Esq.
Miles & Stockbridge
10 Light Street
Baltimore, Maryland  21202

                                                                                                  _____
                                                                                                        Susan Stevens Miller
                                                                                                              General Counsel