**BEFORE THE**
**PUBLIC SERVICE COMMISSION**
**OF MARYLAND**

|  |  |  |
|---|---|---|
| **In the Matter of the** | ) | |
| **Investigation into Recurring Rates** | ) | **Case No. 8879** |
| **For Unbundled Network Elements** | ) | |
| **Pursuant to the Telecommunications Act** | ) | |
| **Of 1996** | ) | |

**MCI'S PETITION FOR RECONSIDERATION**
**AND REQUEST FOR CLARIFICATION**

Chana S. Wilkerson
Kimberly A. Wild
MCI
1133 19th St., NW
Washington, DC 20036
(202) 736 - 6739

Carville B. Collins
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD  21209-3600
(410) 580-4125

Attorneys for MCI

July 30, 2003

## TABLE OF CONTENTS

I.      INTRODUCTION                                                                    1

II.     THE COMMISSION'S ADOPTION OF VERIZON'S COST MODELS IS
        INCONSISTENT WITH THE FCC'S TELRIC METHODOLOGY
        AND THE APPLICABLE LAW                                                          3

        A.      The FCC Explicitly Rejected An Embedded Cost Approach                   4
        B.      Verizon's "Real World" TELRIC Is Contrary to the Law                    5

III.    THE COMMISSION ERRED IN ADOPTING VERIZON'S COST MODELS                          7

IV.     THE COMMISSION'S LIMITED USE OF GR303 IDLC DOES NOT REFLECT
        TELRIC PRINCIPLES                                                              8

V.      THE COMMISSION'S DECISION ON SWITCH COSTS ARE INCONSISTENT
        WITH TELRIC PRINCIPLES                                                         10

        A.      The Commission Erred in Not Adopting A Flat Rate Switching Design      10

                1. Cost Causation                                                      10
                2. Discrimination                                                      13
                3. Implementation of the Flat Rate Design                             14

VI.     THE COMMISSION'S DECISION ON HOTCUTS ARE INCONSISTENT
        WITH TELRIC PRINCIPLES                                                         14

VII.    REQUEST FOR CLARIFICATION                                                      16

VIII.   CONCLUSION                                                                     17

**BEFORE THE**
**PUBLIC  SERVICE COMMISSION**
**OF MARYLAND**

| | | |
|---|---|---|
| In the Matter of the | ) | |
| Investigation into Recurring Rates | ) | **Case No. 8879** |
| For Unbundled Network Elements | ) | |
| Pursuant to the Telecommunications Act | ) | |
| Of 1996 | ) | |

**MCI'S PETITION FOR RECONSIDERATION**
**AND REQUEST FOR CLARIFICATION**

**I.    INTRODUCTION**

WorldCom, Inc. (hereinafter "MCI") hereby submits this motion for reconsideration of

the Order No. 78552 ("UNE Order") in Case No. 8879, *I/M/O the Investigation Into Rated For*

*Unbundled Network Elements Pursuant to the Telecommunications Act of 1996,* issued by the

Maryland Public Service Commission ("Commission") on June 30, 2003.  From its outset, the

purpose of this proceeding has been to establish forward-looking, cost-based rates for unbundled

network elements ("UNEs") in accordance with the Total Element Long-Run Incremental Cost

("TELRIC") methodology adopted by the Federal Communications Commission ("FCC") in the

*Local Competition Order*.[1]  As specified below, this Commission's order fails to adhere to the

TELRIC methodology in several material aspects:

- **Adoption of Verizon's Cost Models** – Where one starts the costing analysis

  affects where one ends up.  Thus, while it is possible to adjust, modify, or correct

  the Verizon models to remove some of the more blatant violations of TELRIC, it

  is impossible to turn the sow's ear of Verizon's models into the silk purse of

---

[1] *First Report and Order,* CC Docket No. 96-98, released August 8, 1996 ("*Local Competition Order*").

TELRIC. The Commission should have adopted the Modified Synthesis Model proposed by MCI and AT&T.

- ***Failure to use 100% NGDLC with GR303*** - Having adopted Verizon's loop model, the Commission adopted the use of only 50% NGDLC with GR303. Consistent with the FCC's "scorched node" approach to TELRIC, the Commission should have adopted a loop technology that incumbent local exchange carriers ("ILECs") would use going forward to build loops. Evidence in this docket demonstrated that Verizon uses NGDLC with GR303 as the forward looking loop design technology. The Commission should have adopted 100% NGDLC with GR303 as the loop design.

- ***Rejection of flat rate switching rate design*** – Rate design must follow cost causation. Failure to do so results in uneconomic consumption and discrimination. The uncontroverted evidence in this docket is that switching does not have a "per minute of use" cost, yet the Commission adopted a "per minute of use" rate. The flat rated switching rate design proposed by MCI best reflects switch cost causation, and the Commission should have adopted it.

- ***Use of embedded methodology in the hot cut NRC***. The Commission adopted Verizon's model for determining the NRC associated with performing "hot cuts" (the cross-connection of unbundled loops to CLECs). This is inconsistent with forward looking cost analysis because it "models" Verizon's existing, embedded (and inefficient) process for performing hot cuts. Adoption of Verizon's model is also inconsistent with the use of GR303 in the loop plant. Further, new evidence uncovered since the close of this record indicates that Verizon is using new

technologies to perform cross-connects in some locations. The Commission

should reconsider its adoption of Verizon's NRC for hot cuts. To the extent the

Commission does not change its decision, the Commission should re-open the

record on this issue to re-examine the issue in light of the new evidence or initiate

further proceedings to reexamine all hot cut rates**.**

## II.    THE COMMISSION'S ADOPTION OF VERIZON'S COST MODEL IS INCONSISTENT WITH THE FCC'S TELRIC METHODOLOGY AND THE APPLICABLE LAW.

Viewed in terms of all the various modeling assumptions and inputs, the task before the

Commission may have appeared daunting. Fortunately, however many of the issues addressed

by the parties are actually offshoots of one central issue. Specifically, whether Verizon's cost

models comply with the "hypothetical" network standard that is one of the components of the

FCC's mandated TELRIC methodology. Consistent with the Supreme Court's affirmation of the

FCC's TELRIC methodology the Commission cannot disregard the TELRIC standard in this

case. As correctly stated by the Commission under that TELRIC standard, "the Court minimized

any notion that this Commission should set rates based on historical cost data provided by

incumbents."[2] Specifically, the Court found that the statutory provisions obligating the

incumbents to lease their property, § 251(c)(3), and offer their services for resale at wholesale

rates, § 251(c)(4), are consistent with the promulgation of a rate setting method leaving state

commissions to do the work of setting rates without any reliance on historical cost data provided

by incumbents.[3] Thus, in reviewing the myriad of issues raised in this case, the fundamental

issue for the Commission to decide was – did the cost models and studies of the parties' comply

with the FCC's TELRIC standard - including the "hypothetical network" portion of that

---

[2] UNE Order at p. 13.

standard.  The record in this proceeding clearly demonstrated that Verizon's cost model and studies do not comply with the FCC's TELRIC standard.  In contrast, the ATT/MCI model does comply with the FCC's TELRIC standard.

The Commission's adoption of Verizon's cost models to set UNE rates in this case clearly does not comport with the FCC's TELRIC methodology.  As detailed herein, Verizon's brief is loaded with references to its cost models being "realistic" TELRIC and based on "actual" deployment.  Semantics aside, this clearly indicates that Verizon's models are based on, derived from, infected with Verizon's own embedded network and technologies.  As recognized by Verizon in its Supreme Court filing, in doing a proper, lawful TELRIC study, the Commission must ask what elements would cost if the "entire telephone network were rebuilt from scratch [assuming the existing wire center locations]" deploying "solely the latest technology," and maintaining "optimal network design."  Merely labeling its studies "TELRIC" does not make Verizon's studies TELRIC.[4]  Verizon's studies and Verizon's proposed inputs fail to meet that standard and therefore should have been rejected.

### A.    The FCC Explicitly Rejected an Embedded Cost Approach

In adopting a TELRIC methodology to determine UNE costs, the FCC looked at several different approaches.[5]  The FCC explicitly rejected utilizing an embedded cost methodology, as used in the Verizon cost models, studies and assumptions in this proceeding.  Specifically, the FCC stated:

Under the second approach, the cost of interconnection and unbundled

---

[3] *Verizon Communications, Inc.* v. FCC, 535 U.S. 467, 122 S.Ct. 1646 (2002) at p. 1668 n. 20.

[4] The issue of the use of GR303 NGDLC highlights Verizon's mischaracterization of TELRIC.  If in a TELRIC study the network must be rebuilt from scratch using the most efficient technology (as discussed by Verizon in its Supreme Court brief) then the Commission must require Verizon to utilize 100% GR303 in the loop models in Maryland.

[5] Verizon Initial Brief at pp. 11-13.

network elements would be based on existing network design and technology that are currently in operation.  **Because this approach is not based on a hypothetical network in the short run, incumbent LECs could recover costs based on their existing operations, and prices for interconnection and unbundled elements that reflect inefficient or obsolete network design and technology.  This is essentially an embedded cost methodology**.[6]

The FCC determined that prices for interconnection and access to UNEs would be developed from a forward-looking economic cost methodology based on the most efficient technology deployed in the incumbent LEC's current wire center locations.[7]  The FCC believed that this approach, *i.e.*, TELRIC, fell between an embedded cost methodology and a methodology based solely on least-cost, most efficient network configuration and technology. The FCC stated:

> This approach mitigates incumbent LECs' concerns that a forward-looking pricing methodology ignores existing network design, while basing prices on efficient, new technology that is compatible with the existing infrastructure…. We therefore conclude, that **the forward-looking pricing methodology for interconnection and unbundled network elements should be based on costs that assume that wire centers will be placed at the incumbent LEC's current wire center locations, but that the reconstructed local network will employ the most efficient technology for reasonably foreseeable capacity requirements.**[8]

## B.    Verizon's "Real World" TELRIC is Contrary to the Law

At the outset of its brief, Verizon makes clear that its case is based on ***its*** definition of TELRIC not the FCC's.  Throughout the brief, Verizon is very clear about the TELRIC methodology upon which its models are based – "Verizon MD's model is designed to comply with the most ***economically appropriate*** interpretation of TELRIC, and is rooted, to the extent possible, in the rational choices that Verizon MD, acting efficiently over the long run, would

---

[6] *First Report and Order*, CC Docket No. 96-98, released August 8, 1996 at paragraph 684.  ("Local Competition Order") (emphasis added).

[7] Local Competition Order at ¶685.

[8] Id.

make going forward."[9]  With regard to the CLEC's approach to TELRIC Verizon declares that

"this hypothetical scorched-node" approach has nothing whatsoever to do with Verizon MD's

network …."[10]

From Verizon's statements and the evidence in this proceeding, it is clear that Verizon

has attempted to redefine TELRIC as an embedded cost methodology.  Instead of a study that

starts with existing wire center locations and then deploys the most efficient, least cost

technology available for the remainder of the network, Verizon's studies utilize its existing

network (including switches), real and actual data and deployment plans.  With this redefinition,

Verizon asserts numerous times over that it is operating "within the constraints of TELRIC" and

that it has filed studies that "… present the most reasonable basis for estimating the TELRIC

costs for a forward-looking local exchange network in Verizon MD's territory.  Of course, these

"real world" "forward looking" costs – as Verizon distorts that term – are based on choices

Verizon would purport to make based on Verizon's existing network technology deployment,

rather than on any type of TELRIC approach.  As discussed above, the FCC expressly rejected

the embedded cost approach when it adopted the TELRIC methodology.  Moreover, in

upholding the FCC's TELRIC methodology, the Supreme Court similarly rejected the embedded

cost methodology raised by Verizon and other incumbents.[11]

While it is tempting to dismiss the choice of models as inconsequential, the choice of

model does matter.  Where one starts with the modeling analysis will affect where one finishes.

It may be possible to route out some of the more blatant errors or non-TELRIC aspects of

Verizon's models.  But as the Commission recognized, Verizon's models are all but "black

---

[9] Verizon Initial Brief at p. 6.

[10] Id.

[11] Verizon Communications at p. 1671.

boxes." The models are extremely difficult to understand and re-run. As a result, it is practically

impossible to have any reasonable degree of certainty that one has routed out all the potential

areas where Verizon has infused its models with its distortion of TELRIC principles.

## III.    THE COMMISSION ERRED IN ADOPTING VERIZON'S COST MODELS

Ironically, the Commission rejected the only model offered in this proceeding that is

based on a cost model that the FCC itself has determined is compliant with TELRIC principles –

the Modified Synthesis Model. The Modified Synthesis Model is based on the FCC's own

Synthesis Model, which the FCC has adopted for identifying TELRIC costs associated with the

provision of universal service. As detailed by the testimony, MCI/ATT witnesses modified the

FCC's model to make it applicable in UNE costing proceedings. At its core the MCI/ATT

model is a TELRIC model.

The Commission rejected the Modified Synthesis Model for the wrong reasons. First, the

Commission said that model contained errors and required revision. This criticism applies

equally well to the Verizon model that the Commission adopted, however. Indeed, the multiple

"scenarios" that the Commission ordered to be run on the Verizon model indicates the multiple

errors and problems with Verizon's models. Second, the Commission stated that the Modified

Synthesis Model was more appropriate for universal service. Indeed it was true that the

Modified Synthesis Model was based on the FCC's universal service model. That is the model's

strength, not it's weakness. However, in this proceeding the FCC's model was modified to make

it appropriate in a UNE context. Despite Verizon's best efforts, it could not muster more than a

few, inconsequential arguments against the Modified Synthesis Model. The Commission should

have adopted the Modified Synthesis Model, the only model in this case that is consistent with

the FCC's TELRIC principles.

## IV.    THE COMMISSION'S LIMITED USE OF GR303 IDLC DOES NOT REFLECT TELRIC PRINCIPLES.

The Commission in its Order, concluded that the cost studies used to set the rates for

unbundled network elements should utilize 72% Digital Loop Carrier ("DLC") and 28% copper.

Of the 72% DLC, the Commission concluded that 50% should be GR303 Integrated Digital

Loop Carrier ("IDLC") with the remaining 50% being Universal Digital Loop Carrier

("UDLC").[12]  The unsubstantiated use of 50% GR303 IDLC by the Commission in its Order flies

in the face of TELRIC and must be corrected.  The Commission should reconsider this issue and

require 100% GR303 IDLC be utilized in the cost studies in order to render them TELRIC

compliant.

As discussed above, TELRIC requires that forward looking, cost-based rates be set based

on the ***most efficient, least cost technologies***, starting only with the locations of the LEC's

existing wire centers.  TELRIC does not allow for the use of embedded or historical data to set

rates.

GR303 IDLC is the least cost most efficient technology available today and should be

utilized fully in TELRIC studies.  There is ample evidence in the record from multiple parties

that IDLC is the least cost technology that is available today and no evidence in the record

refuting that fact.[13]  In addition, evidence in the record shows that technological developments

have made GR303 IDLC systems fully capable of DS0 unbundling.[14]  This evidence clearly

demonstrates that GR303 ICLD is the least cost, most efficient technology available today and

should be utilized in TELRIC cost studies.  Use of 50% GR303 IDLC by the Commission

---

[12] Commission Order at pp. 43-46.

[13] *See,* ATT/WorldCom Exh. 30 at pp. 20-23, 24-27; Staff Exh. 37 at pp. 10-11; OPC Exh. 1 at pp. 83-86.  Use of concentration with GR303 IDLC renders an even more dramatic cost difference between UDLC and IDLC.

[14] *See,* Rebuttal Testimony of Timothy J. Gates at pp. 38-39 and Exh. TJG-2.

(versus 100%) is simply not compliant with a technologically efficient and forward-looking network as required by TELRIC.

In support of its use of 50% GR303 IDLC, the Commission offers no reasoning, sound or otherwise, for its conclusion. Instead, the Commission in its Order questions whether the use of 100% GR303 IDLC is "actually achievable" taking into consideration the existing LEC wire centers.[15] However, rather than attempt to answer that question, the Commission simply concludes, without additional analysis, that 50% GR303 IDLC is the appropriate number.[16] It is not. Overwhelming evidence in the record, as referred to above, shows that GR303 IDLC is the technology that should be utilized in a TELRIC cost study.

The limited use of GR303 IDLC by the Commission will needlessly increase UNE costs and provide Verizon with a cost advantage. The Commission's Order as it stands will impose UDLC costs on Verizon's competitors where the forward-looking TELRIC network construct contemplates the use of more efficient, less costly GR303 NGDLC. Not only is there no meaningful barrier to unbundling IDLC loops, UDLC is an outmoded, high-cost, embedded technology that has no place in a forward-looking TELRIC network. The Commission should reconsider this portion of its order and require use of 100% GR303 IDLC in the cost studies. At the very least, the Commission should use 100% GR303 IDLC in that portion of the loop model that the Commission determines should be IDLC. The Commission's use of 50% UDLC in this portion of the model completely violates TELRIC principles. UDLC is relatively expensive and

---

[15] *Id* at p. 46.

[16] As discussed above, Verizon had argued, among other things, that 100% GR303 IDLC was impossible because IDLC cannot be unbundled. The Commission did not adopt this argument. Even if they had, evidence in the record demonstrates that there are multiple valid options for unbundling IDLC. *See*, Rebuttal Testimony of Timothy Gates at pp. 38-39 and Exhibit TJG-2.

extremely old loop technology that even Verizon is not deploying any more for its own use.

UDLC simply has no place in any forward-looking model (or network).[17]

## V.     THE COMMISSION'S DECISIONS ON SWITCH COSTS ARE NOT CONSISTENT WITH TELRIC PRINCIPLES.

### A.     The Commission Erred in Not Adopting A Flat Rate Switching Design.

The Commission's adoption of Verizon's two-tiered switching rate design violates

TELRIC's cost causation principles and is discriminatory.  For the reasons discussed below, the

Commission should reconsider its decision on switching rate design and adopt the flat rate

switching design proposed by MCI in this proceeding.

### 1.     Cost Causation

The basis of the Commission's adoption of the per minute of use (MOU) charge based on

the two-tiered switching rate is that, "… there is in fact a cost involved in switching calls, and

that there is a relationship between those costs and call volumes."[18]  One can acknowledge that

there are costs associated with "switching calls" without it necessarily following that switching

costs must have a per minute of use rate design.  In other words, acknowledging that switching

as associated costs is not where the rate design analysis ends.  To follow appropriate cost

causation principles as required by TELRIC it is important to understand how switches are

purchased.  The record in this case is clear that switches are purchased based on capacity (in the

same way that one purchases computer memory), which includes all the normal peak/busy call

usage from the anticipated number of working lines.  Therefore, there are not any per minute of

use  costs associated with the purchase of the switch.  Adoption of a per minute of use rate

---

[17] See, In the Matter if the Board's Review of Unbundled Network Elements Rates, Terms and Conditions of Bell Atlantic-New Jersey, Inc.  Docket No. TO00060356 at p. 72, 100% IDLC is appropriate in a forward-looking environment.

[18] UNE Order at p. 64.

design when there are no per minute of use costs of the switch violates fundamental cost causation principles.

The flat rate switch design is the best way to reflect these capacity costs while complying with the FCC's requirement that costs be recovered, "in a manner that reflects the way that they are incurred."[19]  Flat rate switch design follows precisely how switching is purchased by the ILEC.  When ILECs purchase switching from the switch vendors, the vendors cost/price the switching according to the number of lines (and the anticipated switching capacity) of the switch. In other words, switch vendors sell ILECs chunks of switching capacity.  It is this very "chunk" of switching capacity rate design that flat rated design emulates.

Consistent with the arguments made by MCI in this proceeding, the Wisconsin PSC found that,

> "…switch manufacturers design enough switching fabric and processor capacity into their switches to serve the maximum lines that can be installed on the switch without blockage, based upon the expected use per line. In its own contracts with its switch vendors, Ameritech agreed to pay for its switches on a per-line basis without any usage fees, but there are provisions that assess extra charges when Ameritech needs to order additional equipment to accommodate usage growth." [20]

The Wisconsin PSC findings confirm that there are not any usage sensitive costs that necessitate or justify per MOU charges for switching - "because of the way switches are engineered and the way Ameritech pays for its switches, there is no compelling cost or engineering rational for requiring a rate design that includes a minutes-of-use charge."[21]  Furthermore, as found by the

---

[19] Local Competition Order at ¶ 622.

[20] Investigation Into Ameritech Wisconsin's Unbundled Network Elements, 6720-TI-161 February 28, 2002, at  p. 81 ("Wisconsin Order")

[21] Id. at p. 82.

Illinois Commerce Commission, the CLEC purchase of the unbundled switching element on a per line or flat rate basis, is "consistent with the fundamental principles of cost causation."[22]

Rather than usage sensitive costs, like Ameritech, Verizon may incur some capacity costs (non-usage sensitive) to the extent that there is excessive usage at peak times. The Commission's concern about recovery for usage sensitive switching elements is misplaced. The issue for the Commission is how best to reflect any excess capacity costs in the rate design. Because the flat rate switching design is consistent with how Verizon recovers local switching costs from its retail residential customers, it is the more appropriate way to recover switching costs. In both the Wisconsin and Indiana decisions adopting flat rate switching, the Commissions recognized that CLECs, their customers and local competition would be harmed if the ILEC recovers switching costs from its retail customers on a flat rate basis while the ILEC collects switching costs from CLECs based on usage.[23] The primary policy concern and compelling reason for adopting flat rate switching was the Commission's recognition "… that in order to compete with Ameritech, CLECs need to pay for their unbundled switch in the same way that Ameritech pays for its switching."[24] The ability of CLECs to compete with Verizon and the development of local competition in Maryland is a similarly compelling policy concern that should result in the Maryland Commission's adoption of flat rate switching.

---

[22] Investigation into Forward Looking Cost Studies and Rates of Ameritech Illinois for Interconnection, Network Elements, Transport and Termination of Traffic; Illinois Bell Telephone Company Proposed Rates, Terms and Conditions for Unbundled Network Elements, 96-0486 Consolidated 96-0569, 1998 Ill PUC Lexis 109 at p. 150.

[23] See, Wisconsin Order at p. 82; See also In the Matter of the Commission Investigation and Generic Proceeding on Ameritech Indiana's Rates for Interconnection, Service, Unbundled Elements, an Transport and Termination Under the Telecommunications Act of 1996 and Related Indiana Statutes, Cause No. 40611-S1 Phase I, at p.42. (Feb. 22, 2002) ("Indiana Order") at p. 42.

[24] Wisconsin Order at p. 83.

## 2.    Discrimination

The per-minute of use rate design violates principles of non-discrimination and places CLECs at a disadvantage.[25]  CLECs and Verizon should face the same underlying cost structure for local switching if they are to compete on a "level playing field."  In that sense, the rate design of local switching should be competitively neutral.  Verizon's local switching cost structure is reflected in the vendor contracts.  Because MCI purchases local switching from Verizon (typically as part of UNE-P), MCI's cost structure is the rate Verizon charges for local switching. To the extent Verizon's rate for local switching is different from the underlying vendor cost, then the playing field is not level.  When a CLEC's cost of switching varies according to minutes of use, then it does not take a significant amount of usage for the CLEC's costs to skyrocket.  For example, if a CLEC had 1200 minutes of use on the switch on either end (which is not an unreasonable amount of usage), then under the switching rate design adopted by the Commission, the CLEC's cost of switching would be $4.46 per month, per line (including the $1.32 port charge).  In contrast, for that same customer, Verizon's cost of switching does not vary between 500 minutes of use on either side and 1200 minutes of use on either side (because Verizon buys its switches on a per line basis).  The per-minute of use rate design therefore inherently discriminates against CLECs.[26]  As a result, if the per-minute rate design is permitted to stand, and the flat rated switching rate design is not also ordered, the costs of UNE-P for CLECs will vary wildly.  UNE-P costs will be far out of proportion to any variance of underlying cost and far out of proportion when compared to Verizon's own costs.

---

[25] Indiana Order at p.42.

[26] Indeed, the introduction of "all you can eat" products, such as MCI's The Neighborhood or Verizon's "Freedom" product, make the potential for competitive harm from this discriminatory rate structure even more dramatic.

Simply put, the competitors cost structure (as reflected in the rates paid to Verizon) must be the same as Verizon's cost/rate structure. Since Verizon does not pay switch vendors any additional cost per MOU, MCI should not have to pay to Verizon a rate per MOU. Moreover, since Verizon pays to switch vendors costs based on per line, then MCI should have the option of a flat rated, per line, switching rate. Accordingly, the Commission should adopt MCI's flat rate switching design proposal on reconsideration.

### 3.    Implementation of the Flat Rate Design

In recommending that the Commission adopt a flat rate switching design in addition to the traditional switching rate design, it is not MCI's intent to allow CLECs the option to "pick and choose" switching rate design on the basis of the characteristics of specific individual customers. The Commission's adoption of both switching rate designs would be subject to the requirement that each competitor choose only one rate design for all of its unbundled switching.

## VI.    THE COMMISSION'S DECISION ON HOT CUTS IS INCONSISTENT WITH TELRIC PRINCIPLES

The FCC's TELRIC Principles require inter alia, that rates for UNEs including non-recurring costs ("NRCs") be forwarding looking. As discussed in the ATT/MCI brief, Verizon's entire non-recurring cost model ("NRCM") is based on backward looking embedded network assumptions, incorrect economic concepts, and faulty survey data.[27] Added to this is the model's failure to reflect automated operations support systems ("OSS") and efficient processes. These fatal flaws, are clear evidence that Verizon's model for determining the NRCs is inconsistent with a forward looking cost analysis. A forward looking costs analysis should recognize the most efficient processes which includes automated processes rather than the manual processes

---

[27] ATT/MCI Initial Brief at p. 83.

used by Verizon. Verizon's model does not. Thus the Commission erred in adopting Verizon's model.

Consistent with MCI's argument, the New Jersey Board of Public Utilities ("Board") found that Verizon NJ's development of NRCs (including those for hotcuts) failed to properly consider the deployment of OSS on ordering, processing and provisioning. The Board also found that a key feature of modernized OSS is the ability to process orders with little or no manual intervention and that manual intervention should not be necessary in a forward looking environment.[28] As a result the Board made substantial modifications to the Verizon model.[29]

The Commission's adoption of Verizon's proposed NRCs for hot cuts is of particular concern.[30] Verizon's hot cut NRCs are inconsistent with the use of GR303 in the loop plant. Unbundling loops via GR303 IDLC can be done electronically. This electronic process eliminates the manual jumper work at the frame and renders the loop provisioning process more efficient. Therefore, in a forward looking analysis which assumes 100% GR303 IDLC in Verizon's network, electronic provisioning is quicker, more efficient and less expensive than the manual hot cut process modeled by Verizon.

Further, new evidence uncovered since the close of this record indicates that Verizon is using new technologies to perform cross-connects in certain locations. These technologies are the type of forward-looking technologies that should have been modeled by Verizon to determine the hotcut NRC. Both more information and further investigation are necessary to make this determination. Therefore the Commission should reconsider its adoption of Verizon's

---

[28]  See, In the Matter if the Board's Review of Unbundled Network Elements Rates, Terms and Conditions of Bell Atlantic-New Jersey, Inc. Docket No. TO00060356 at p. 160.

[29] Id. at pp. 157-167.

[30] The hotcut issue is of critical importance in light of the pending FCC Triennial Review Order and the move toward more facilities-based provisioning by CLECs.

NRC for hotcuts.  To the extent the Commission does not change its decision, the Commission

should re-open the record on this issue to re-examine the issue in light of the new evidence or

initiate further proceedings to reexamine all hotcut rates.[31]

## VII.    REQUEST FOR CLARIFICATION

Regarding the rates for unbundled network elements, the Commission's stated that, "the

decisions contained in this Order reflect the inputs contained in the Commission's previously

issued Scenario A2_R.  The Commission expects the results of A2_R to be the rates resulting

from this Order."[32]  Thereafter, the Commission directed Verizon to submit a compliance filing

within thirty (30) days of the date of the Order.[33]  Then in the Ordering Clause (1), the

Commission states that the rates and charges for unbundled network elements adopted in this

Order are final rates and charges.[34]  Since the Commission did not expressly adopt the results of

Scenario A2_R as the UNE rates and ordered Verizon to submit a compliance "run" consistent

with the inputs in the Order, it is unclear whether the UNE rates in Scenario A2_R became

effective with the issuance of the Commission's Order on June 30, 2003, or whether upon

submission of Verizon's compliance filing the rates contained therein will the UNE rates and

effective as of the date of Verizon's submission.

The rates for unbundled network elements that the Commission establishes in this

proceeding will form a significant portion of the basic cost structure for MCI in the Maryland

residential local markets.   The rates for UNEs established here will, in large part, be used to

---

[31] See, *In the Matter if the Board's Review of Unbundled Network Elements Rates, Terms and Conditions of Bell Atlantic-New Jersey, Inc*.  Docket No. TO00060356, Order on Reconsideration at p. 38.  "We <u>DIRECT</u> our Staff to initiate a process to reexamine all hotcut rates six months prior the expiration on March 5, 2004 of Verizon NJ's voluntary reduction to determine, <u>inter alia,</u> the extent to which automation of hotcuts is possible as well as the just and reasonable forward looking rates for hotcuts."

[32] UNE Order at p. 138.

[33] Id.

determine the cost of residential service.  It is therefore critical for MCI to have a clear understanding of precisely what the UNE rates are and when they are effective.  Accordingly, MCI requests that the Commission clarify that the rates in Scenario A2_R were effective with the issuance of the Commission's Order on June 30, 2003.

## VIII.   CONCLUSION

For the reasons set forth above, on reconsideration the Commission should adopt the recommendations set forth herein and issue the clarification requested by MCI.

Respectfully submitted,

_____

Chana S. Wilkerson
Kimberly Wild
Senior Attorneys
MCI
1133 19th St., NW
Washington, DC 20036
(202) 736 - 6739

Carville B. Collins
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD  21209-3600
(410) 580-4125

Attorneys for MCI

July 30, 2003

---

[34] Id.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 30, 2003, copies of the attached MCI's Petition for Reconsideration and Request for Clarification were provided via first class U.S. Mail, postage prepaid, to the Parties of Record in Case No. 8879.

_____

Carville B. Collins