BEFORE THE
PUBLIC SERVICE COMMISSION OF MARYLAND

| | |
|---|---|
| **In the Matter of** ) | |
| ) | |
| The Investigation into Recurring ) | Case No. 8879 |
| Rates for Unbundled Network ) | |
| Elements Pursuant to the ) | |
| Telecommunications Act of 1996 ) | |

### REPLY TO PETITION FOR RECONSIDERATION
### AND MOTION FOR STAY OF NON-RECURRING CHARGES

COMES NOW Cavalier Telephone Mid-Atlantic, LLC ("Cavalier")[1] and hereby replies to Worldcom Inc.'s ("MCI") and AT&T Communications of Maryland Inc.'s petitions for reconsideration of the Maryland Public Service Commission's ("Commission") Order No. 78552 ("Maryland UNE Order" or "Order") and, in conjunction therewith, Cavalier moves to Stay the Non-Recurring Charges ("NRCs") imposed by the Order.

The purpose of this proceeding has been to establish forward-looking, cost-based rates for unbundled network elements ("UNEs") in accordance with the Total Element Long-Run Incremental Cost ("TELRIC") methodology adopted by the Federal Communications Commission ("FCC") in the *Local Competition Order.*[2] While largely achieving these ends for UNE monthly recurring charges ("MRCs"), the Order has failed the TELRIC standard with respect to UNE NRCs. The resulting hot cut charges and similar up-front NRCs are exorbitant and threaten to choke competition. Cavalier joins MCI and AT&T in urging the

---

[1] On August 12, 2003, Cavalier filed with the Commission a Petition to Intervene, which Petition was not opposed by the parties to this proceeding.
[2] *First Report and Order,* CC Docket No. 96-98, released August 8, 1996 ("*Local Competition Order*").

Commission to reconsider the NRC aspects of the Order and to direct Verizon Maryland, Inc. ("Verizon") to re-run a TELRIC-compliant cost model that will result in a fair UNE NRC structure conducive to competition.

To maintain stability in Maryland's telecommunications market, the Commission should also stay the new UNE NRCs, especially in light of the FCC's recent Triennial Review Order. The Commission should not allow new NRCs to take effect until, at least, the Commission completes the FCC-mandated batch hot cut proceedings, whose results are due by July 2004. Alternatively, Cavalier urges the Maryland Commission to follow its counterparts in New York, New Jersey and Delaware by ordering an interim $35 hot cut rate until the Commission and the industry can develop and achieve a tenable NRC regime.

## ARGUMENT

**I.    Cavalier Agrees with AT&T and MCI that the Commission Must Reconsider the Order's NRCs, Else Risk the Demise of Competition, Particularly in Maryland's Residential Market.**

Cavalier agrees with MCI and ATT that the Commission should reconsider and reject the non-recurring cost model ("NRCM") of Verizon in favor of the NRCM of AT&T and MCI. As stated by AT&T, use of Verizon's NRCM results in NRCs that will <u>triple -- and in some cases more than triple</u> – a CLEC's up-front costs of obtaining UNEs.[3] This rate hike is particularly odious because the CLEC incurs the NRC before receiving its first dime of revenue from its newly cutover customer. There is simply no record basis, let alone public policy rationale, for

---

[3] AT&T Petition for Rehearing and Reconsideration, dated July 30, 2003 ("AT&T Petition") at 15 (emphasis added).

2

allowing such an extreme rate to take effect and the Commission should thus reconsider and reject it.

As MCI notes in its Petition for Reconsideration and Request for Clarification ("MCI Petition"), the NRC portion of the Order is tainted by the Commission's consideration of Verizon's NRCM. The Verizon NRCM is based upon backward looking embedded network assumptions, incorrect economic concepts, faulty survey data, failure to reflect automated operations support systems, and inefficient processes.[4]

As such, the resulting NRCs in the Order are fundamentally flawed. The FCC recently rejected this flawed cost model, and ordered that non-recurring costs be established pursuant to the AT&T/MCI non-recurring cost study, to set prices in Virginia.[5]

Indeed, as AT&T points out, despite the "anachronistic processes, false and unnecessary task times, and double cost recovery", the "Commission's Order acknowledges the significant methodological flaws inherent in Verizon's cost study, but adopts it anyway."[6] As a result of Verizon's defective NRCM, according to AT&T, "the current rate for hot cuts is $7.80, reflected as a

---

[4] MCI Petition, dated July 30, 2003, at 14.
[5] See Memorandum Opinion and Order, DA 03-2738, at ¶ 696, *In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc., and for Expedited Arbitration*, CC Docket No. 00-218 and *In the Matter of Petition of AT&T Communications of Virginia, Inc., Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc.*, CC Docket No. 00-251 (rel. Aug. 29, 2003).
[6] AT&T Petition at 16, citing the Order at 87-100.

3

'coordinated cutover' rate[, but t]he new rate from Case 8879 [could potentially][7] exceed $175, *an increase of over 2200%.*"[8]

In Maryland, according to Verizon's revised Detailed Schedule of Itemized Charges/Appendix A to the Pricing Attachment[9], the UNE Order has resulted in the following representative up-front NRC hikes:

・Two Wire Hot Cut (without field dispatch) – increasing **from $18.40 to $136.87**
・Two Wire Initial Loop (with field dispatch) – from $74.42 to $160.37
・DS-1 Loop (with field dispatch, expedited) – from $123.91 to $288.58

Moreover, while the general NRC increase is a problem in itself, it is all the more acute when considered with the minimal spread between CLECs' monthly recurring UNE charges and Verizon's own monthly retail rate – itself arguably the most important influence on a CLEC's retail rate.[10]  Even assuming historically low levels of residential customer churn, a CLEC would never recover its own monthly recurring costs plus Verizon's proposed NRCs over any reasonable period.  These NRC rates are so high they create an untenable barrier to competition.

    **II.  The Commission Should Stay Verizon's New UNE NRCs Pending Completion of the Upcoming Proceedings On Low-Cost and Efficient "Batch" Hot Cuts.**

---

[7] As AT&T indicated, its Petition was drafted prior to Verizon's release of the actual UNE rate list, but the Verizon model actual hot cut rate was sure to jump to a similarly astronomical level.  *See* AT&T Petition at n. 7.
[8] AT&T Petition at 19.
[9] App. A to the Pricing Attachment, dated August 22, 2003.
[10] As reported in TRDaily, "Competitive providers charge consumers rates generally 10% to 50% lower than the rates charged by the Bell companies."  *Pro- CLEC Members Of House Oppose FCC Changes To UNE-P*", TRDaily, 24 January, 2003 (quoting letter to the FCC from nineteen members of the U.S. House of Representatives, including the ranking members of the Judiciary Committee (John Conyers) and Telecommunications and the Internet subcommittee (Edward J. Markey)).

In its August 21, 2003 *Triennial Review Order*[11] (or "TRO"), the FCC acknowledged that the hot cut process is grievously flawed and, thus, ordered state public service commissions to order a fix to the problem by July 2, 2004.[12] The FCC reached this conclusion after reviewing the cutover rates from around the nation and concluding hot cuts are too expensive and inefficient. ***Maryland's newly ordered hot cut rates exceed even the more expensive rates reviewed and cited by the FCC in the TRO.*** Thus, like most public service commissions, the Maryland Commission must decide in the coming months whether and how to arrive at a more efficient "batch cut" process that would slash hot cut rates. To maintain the *status quo* in the telecom market, Cavalier respectfully urges the Maryland Commission to stay its UNE Order to the extent it would result in increased hot cut rates and related NRCs.

As the FCC stated in its TRO, in the seven years since passage of the Telecommunications Act of 1996[13] consumers have witnessed "only minimal deployment" of CLEC switches to serve residential customers.[14] According to the FCC, much of the failure rests upon CLECs' "increased costs due to non-recurring charges" stemming "from the incumbent LEC hot cut process for

---

[11] *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications* Capabilit, CC Docket No. 01-338, Report and Order on Remand and Further Notice of Proposed Rulemaking (rel. August 21, 2003)(hereinafter *Triennial Review Order* or TRO).

[12] The FCC ordered state public service commissions, within nine months of the TRO's effective date, to approve and implement a batch cut process – *i.e.* "a seamless, low-cost process for transferring large volumes of mass market customers" -- "that will render the hot cut process more efficient and reduce per-line hot cut costs." *Id.* at 287, ¶¶423, 460.  Alternatively, "if appropriate for any particular geographic market, state commissions must issue detailed findings supporting a conclusion that current hot cut processes do not give rise to impairment in a market and that a batch cut process is therefore unnecessary." *Id.*

[13] Pub. L. No. 104-104, 110 Stat. 56, *amending* Telecommunications Act of 1934, 47 U.S.C. § 151 *et seq.*

transferring DS0 loops".[15]  As proof, the FCC cited a litany of hot cut rates – for example, **$117** in (Oregon)[16] and **$185** (in New York, effective upon sunset of current $35 interim rate)[17] – and the nationwide "average non-recurring charge of approximately **$51**."[18]  Based on this record the FCC declared "the hot cut cost assessed by the incumbent LEC . . . makes it difficult to compete.  Although hot cut costs vary among incumbent LECs, we find on a national level that these costs contribute to <u>a significant barrier to entry</u>."[19]  The FCC went so far as to "conclude that the operational and <u>economic barriers</u>[20] <u>arising from the hot cut process create an insurmountable disadvantage</u> to carriers seeking to serve the mass market[.]"[21]  Also striking, at the other end of the spectrum, was evidence cited by the FCC that the hot cut process can cost as little as **$2** per hot cut.[22]

---

[14] *Triennial Review Order*, at 262, ¶422.
[15] *See* id. (emphasis added)(also noting problems of "high customer churn rates, service disruptions, and incumbent LECs' inability to handle a sufficient volume of hot cuts").
[16] *Id.* fn. 1463.
[17] *Id.* at 296, ¶470 ("Z-Tel's analysis of the New York market indicates that even if the switch itself, collocation, and maintenance were free, with a non-recurring charge of $185 per line, it would be uneconomic to deploy a switch to serve mass market customers in New York.")
[18] *Id.* at 296, ¶470.
[19] *Id.* at 298-99, ¶470 (emphasis added).
[20] Exacerbating CLECs' up-front NRC hardship is the industry problem of significant customer churn.  This "happens most frequently in the first few months after the customer switches to a new carrier" – *i.e.* long before the CLEC has had the opportunity to recover its upfront hot cut costs.  *Id.* at 297, ¶471.  "WorldCom, for example, states that it loses <u>50 percent</u> of its new local customers within the first <u>three months</u> of signing up for service," and "that the high non-recurring costs associated with the hot cut process are almost impossible to recover for customers that switch to another carrier within the <u>first six months</u>."  *Id.* at 296-97, ¶471 & fns. 1451, 1454 (emphasis added).  "Z-Tel estimates that at least four percent of its lines turn over each month", "asserts that carriers in a competitive market cannot expect to keep any particular customer for more than 18-24 months", and "states that even if a competitive LEC received revenues of $30 per month, it would take the competitor more than six months to recover the hot cut costs, a long period of time for a market with significant churn."  *Id.* at 296-97, ¶471 & fn. 1454.  The FCC accordingly concluded "the current level of churn for carriers providing service to the mass market has significant negative revenue effects on the ability of competitive carriers to recover the high costs associated with manual hot cuts."  *Id.* at 297, ¶471.
[21] *Id.* at 300, ¶475 (emphasis added).
[22] *Id.* fn. 1463 (Minnesota's rate).

The FCC's intervening TRO is compelling justification for the Commission to halt the non-recurring charges that would otherwise become effective under this Order. There is no good reason to push through such a radical departure from the extant NRCs, especially as the Commission is likely to find itself significantly shifting, or even reversing, course within a matter of months. The Commission should therefore stay its Order in all respects as it relates to hot cuts and other NRCs.

### II.B. Alternatively, The Commission Should Stay the UNE Order's NRCs and, Following The Path Laid By New York, Delaware and New Jersey, Direct an Interim Hot Cut Rate of $35.

Alternatively, and without waiver of Cavalier's right to challenge the rate imposed, the Commission should leave its current NRC structure in place for the time being. If that is not to be, however, the Commission should stay the new UNE NRCs and, similar to the public service commissions of New York, New Jersey and Delaware, order an interim hot cut rate of $35 -- *an outcome that Verizon itself supported in each of those states.* While Cavalier believes a $35 hot cut rate is neither TELRIC-compliant nor conducive to robust competition, it is preferable to the potential death blow to competition risked by the new NRCs.

In February 2002, the New York Public Service Commission (NY PSC) approved a Verizon Incentive Plan in which, for a two year period, "a Hot Cut Rate of $ 35.00 per loop will apply, in place of the Service Order, C.O. Wiring

7

and Provisioning Charges" for 2-wire and 4-wire loops.[23] Likewise, in July 2002 the New Jersey Board of Public Utilities (NJ BPU), approved a two-year $35 hot cut rate for all non-expedited orders, both initial and additional, for the following order types: *(1) Two Wire Loop Hot Cut; (2) Four Wire Loop Hot Cut; (3) ADSL/HDLS Loop Hot Cut; (4) DDS/56KD Loop Hot Cut; (5) IDLC to Copper Loop Hot Cut, and (6) Line Port Hot Cut.*[24] Expressly following the lead of New York and New Jersey, the Delaware Public Service Commission in 2002 ordered a two-year "hot cut rate of $ 35 to apply to initial or additional orders for any of four types of hot cuts (2-wire loop hot cut, 4-wire loop hot cut, IDLC to copper loop hot cut, line port hot cut)."[25]

In addition to the uniform rate, two common themes emerged from these state commission orders. First, in each case Verizon either proposed or consented without objection to the $35 hot cut rate. Verizon would be hard-pressed to argue the unfairness of a rate it has advocated three times since February 2002, especially given Maryland's proximity to and demographic and topographic similarity with those states. Second, each public service commission recognized this hot cut rate as an interim step and, consistent with the TRO, noted Verizon and the industry must move quickly toward more

---

[23] *See Proceeding on Motion of the Commission to Examine New York Telephone Company's Rates for Unbundled Network Elements. Proceeding on the Motion of the Commission to Examine Issues Concerning Provision of Digital Subscriber Line Services. Proceeding on Motion of the Commission to Consider Cost Recovery by Verizon and to Investigate the Future Regulatory Framework*, Case 98-C-1357, 2002 N.Y. PUC LEXIS 549 at 6 (Oct. 15, 2002).
[24] *In The Matter Of The Board's Review Of Unbundled Network Elements Rates, Terms And Conditions Of Bell Atlantic-New Jersey, Inc.*, D. No. TO00060356, 2002 N.J. PUC LEXIS 298 at 14, 83 (Sept. 13, 2002).
[25] I*n The Matter Of The Application Of Verizon Delaware Inc. (F/K/A Bell Atlantic-Delaware, Inc.), For Approval Of Its Statement Of Terms And Conditions Under Section 252(F) Of The*

efficient provisioning solutions. Indeed, as noted in the MCI Petition, since the close of the record in the instant proceeding, Verizon has already begun employing new cross-connect technologies.[26] Thus the regulatory and technological backdrops support both an interim hot cut rate of $35 and the prompt cutover analysis and rapid response that the Maryland Commission must soon undertake.

## CONCLUSION

For all these reasons, Cavalier supports AT&T's and MCI's petitions for reconsideration, and respectfully urges the Commission to stay the newly ordered UNE NRCs and either reinstate the extant UNE NRCs or order an interim $35 hot cut rate pending completion of the upcoming batch hot cut proceedings and any related review of cutover processes and pricing.

Respectfully submitted,

CAVALIER TELEPHONE
MID-ATLANTIC, LLC

_____
Michael S. Barranco, Esquire
POPE & HUGHES, P.A.
29 W. Susquehanna Avenue
Suite 110
Towson, MD  21204
(410) 494-7777

Counsel for Cavalier Telephone
Mid-Atlantic, LLC

September 12, 2003

---

*Telecommunications Act Of 1996*, PSC D. No. 96-324 PHASE II; Order No. 5967, 2002 Del. PSC LEXIS 103 at 48, ¶¶ 92-95 (June 4, 2002).
[26]MCI Petition at 15.

10