UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

FILED
MAY 25 2000
LARRY W. PROPES, CLERK
COLUMBIA, S C

ENTERED
MAY 25 2000

| | |
|---|---|
| AT&T Communications of the Southern States, Inc., <br><br> Plaintiff, <br><br> and <br><br> MCI Telecommunications Corporation and MCI Metro Access Transmission Services, Inc., <br><br> Plaintiffs in Intervention, <br><br> v. <br><br> BellSouth Telecommunications, Inc., and the Public Service Commission of South Carolina, <br><br> Defendants. <br><br> United States of America, <br><br> Intervenor. | C/A No. 3:97-2164-17 <br><br> ORDER |

## INTRODUCTION AND PROCEDURAL BACKGROUND

The Telecommunications Act of 1996 (the "Act") requires local telephone companies ("incumbents") to make their facilities and services available to competitors at negotiated prices or, if negotiations fail, under terms to be set in arbitration proceedings before state utility commissions. The Act authorizes any party aggrieved by the arbitration decision of a state commission to bring an action in federal court to determine whether the arbitration decision meets the requirements of

72

47 U.S.C. §§ 251, 252. In this case, AT&T Communications of the Southern States, Inc. ("AT&T") seeks judicial review of certain terms of its interconnection agreement with incumbent BellSouth Telecommunications, Inc. ("BellSouth"), as well as review of BellSouth's Statement of Generally Available Terms and Conditions ("SGAT")[1], which were both approved by the Public Service Commission of South Carolina ("PSC"). Also, intervenor MCI challenges certain terms of BellSouth's SGAT.

In 1996, AT&T and BellSouth began to negotiate an interconnection agreement covering South Carolina. Agreement was partially reached, but some issues were not resolved by the parties through the negotiations. As a result, AT&T petitioned the PSC for compulsory arbitration of these issues. The PSC held hearings and then issued its order in March 1997. The PSC's order was incorporated into an executed interconnection agreement between AT&T and BellSouth. The PSC approved the agreement in June 1997.

In May 1997, BellSouth filed, pursuant to section 252(f)(1) of the Act, a proposed SGAT. After a hearing, the PSC issued an order approving the SGAT in July 1997. A revised SGAT was approved in September 1997.

In June 1998, the PSC entered an order establishing a proceeding to address pricing proposals for interconnection and unbundled elements. After proceedings, in September 1998, the PSC approved rates based on BellSouth's methodology.

In July 1998, BellSouth filed a petition to open a proceeding to establish a wholesale discount

---

[1] An incumbent may file with the state commission an SGAT, setting forth the terms and conditions such a company generally offers within that state to any competing local exchange carrier. Under the Act, parties may have the option of choosing services offered by the incumbent under the SGAT, or they may negotiate private interconnection agreements with the incumbent.

2

rate for its Contract Service Arrangements. After a hearing, in December 1998, the PSC issued an order establishing a discount rate of 8.98%.

In July and August 1997, AT&T filed in this court two actions.[2] MCI intervened in one of these actions. Because of the overlap of issues, the parties moved to consolidate the two cases. This court granted that motion in May 1999. In one action[3], AT&T seeks review of certain terms of the interconnection agreement between it and BellSouth. In the other[4], AT&T seeks review of certain terms of the modified SGAT. A review of the complaints reveals that they contain essentially the same allegations of error, which are detailed below.

The parties agree that review by this court is in the nature of an appeal and that the procedure to be followed is analogous to those established by the Federal Rules of Appellate Procedure. On July 8, 1998, the court held a status conference and announced at the conclusion of the conference that the case would be stayed until the Supreme Court completed review of *Iowa Utilities Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), *cert. granted sub nom. AT&T Corp. v. Iowa Utilities Bd.*, 522 U.S. 1089 (Jan. 26, 1998). The Supreme Court issued its opinion on January 25, 1999. *See AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 (1999). In March 1999, this court issued an order establishing a schedule for the filing of amended pleadings, as well as the submission of briefs on the impact of *Iowa Utilities*. The parties have filed the amended pleadings, as well as their briefs. Oral argument was held on March 23, 2000. The case is now ready for consideration and ruling.

---

[2] Amended complaints were filed in April 1999.

[3] *See* First Amended Complaint (C/A No. 3:97-2164-17).

[4] *See* Second Amended Complaint (C/A No. 3:97-2388-17).

3

## LAW/ANALYSIS

### I. Preliminary Matters

#### A. Recent Legal Developments

Prior to analyzing the specific issues raised in this case, it is important to note that since the filing of this action, there have been two significant legal developments that impact upon the analysis of the issues present here. First, as noted above, the United States Supreme Court has issued its landmark decision *AT&T Corporation v. Iowa Utilities*. Second, and more recently, the Fourth Circuit Court of Appeals has handed down two important decisions that directly bear on this case. *See GTE South, Inc. v. Morrison*, 199 F.3d 733 (4th Cir. 1999); *AT&T Communications of Virginia, Inc. v. Bell Atlantic-Virginia, Inc.*, 197 F.3d 663 (4th Cir. 1999).

The particular issues addressed by the Supreme Court and the Fourth Circuit will be discussed throughout this order; however, in this section, a brief overview of *Iowa Utilities* will be given so that the background and context will be clear. In *Iowa Utilities*, the United States Supreme Court reviewed a number of the issues addressed below by the Eighth Circuit Court of Appeals. The Fourth Circuit itself has summarized the developments leading to the Eighth Circuit decision, and the Supreme Court's review:

> On August 8, 1996, the FCC (pursuant to § 251(d)(1) of the Act) issued an order and rules, including rules governing pricing, to implement the local competition provisions of the [Telecommunications] Act. After the rules were challenged in petitions for review filed in several circuits, the proceedings were consolidated and assigned to the Eighth Circuit. The Eighth Circuit first stayed the FCC's pricing rules before their effective date, and then vacated the rules in July 1997, holding that state utility commissions, not the FCC, had exclusive authority to make pricing decisions under the Act. *See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 800 (8th Cir. 1997). On January 25, 1999, the Supreme Court reversed this part of the Eighth Circuit's judgment, holding that the FCC had jurisdiction to issue "rules to guide the state-commission judgments." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. at ----, 119

4

AO 72A
(Rev 8/82)

S.Ct. at 738. Although the Supreme Court remanded for consideration of substantive challenges to the pricing rules, these rules became effective when the Supreme Court issued its judgment. And although the Supreme Court invalidated one of the FCC rules governing access to unbundled network elements, other (non-pricing) rules relating to local competition have been in effect since October 15, 1996.

Bell Atlantic-Virginia, Inc., 197 F.3d at 667-68 (select citations omitted).

### B. Scope of Review

One of the ways in which the above-referenced decisions impact upon the present action is on the question of the scope of review to be applied by this court. In GTE South, 199 F.3d 733, the Fourth Circuit Court of Appeals declared that a state utilities commission's interpretations of the Telecommunications Act are to be reviewed de novo. However, the fact-findings of the commission are reviewed under the substantial evidence standard. Id. at 745. In applying the substantial evidence standard, a court is not free to substitute its judgment for the agency's; it must uphold a decision that has substantial support in the record as a whole even if it might have decided differently as an original matter. Id. at 746. In this case, because the issues involve review of the PSC's interpretations of the Telecommunications Act, the court must examine the PSC's decisions under a de novo standard.

### C. Mootness

BellSouth contends that the court should not consider the issues relating to the SGAT because these issues are now moot. In this case, the SGAT expired in September 1999. BellSouth argues that because the SGAT has expired, all issues relating to it are moot and any decision by this court would be an impermissible advisory opinion.

Although BellSouth is technically correct that the SGAT agreement has expired, several reasons suggest that the court should proceed with analysis of the issues raised. First, it should be

5

noted that the SGAT expired well into the pendency of this action, which was filed in this court in the summer 1997. A decision was delayed in this matter largely because the court was awaiting resolution of the anticipated United States Supreme Court *Iowa Utilities* case, which directly controlled many of the issues in dispute here. Second, the issues relating to the SGAT mirror those in the interconnection agreement; therefore, the court will not be uncovering any issues that would otherwise not already be addressed in this action. Third, these are issues that are capable of repetition, yet evade review. If the current issues are not addressed, they will likely recur in the course of the negotiation of the next potential SGAT inasmuch as pricing and unbundling are central to an SGAT. Finally, Congress intended, as the Fourth Circuit has reiterated recently, that the Telecommunications Act take effect as quickly as possible. It is now some four years since the passage of the Act; therefore, resolving issues that have been fully briefed and argued by the parties in this case would be in keeping with Congressional intent. Therefore, the court rejects BellSouth's mootness objection and will consider the issues related to the SGAT and to the interconnection agreement.

## II. Specific Issues Raised by AT&T

AT&T contends that its interconnection agreement and the SGAT fail to meet the requirements of sections 251 and 252 of the Telecommunications Act in the following respects:

(A) the pricing of unbundled network elements;

(B) restrictions on the combining of network elements;

(C) exclusion of vertical features from the unbundled local switching network element; and

(D) failure to apply the proper standard in establishing wholesale resale discounts and wholesale discount on Contract Service Arrangements.

6

Each issue is discussed separately below.

## A. Pricing of Unbundled Network Elements

AT&T challenges the PSC's choice of pricing methodology and cost model for use in rate-setting, which AT&T asserts do not comply with the FCC's pricing rules. AT&T argues that the FCC's rules prohibit the PSC's adoption of BellSouth's cost model methodology for three reasons: (1) requirement of the use of the TELRIC model; (2) requirement that the hypothetical network be built with the most efficient technology available; (3) requirement that incumbents provide unbundled network combinations.

### (1) TELRIC Model

AT&T argues that the PSC erred in failing to utilize the TELRIC model, as required by FCC rules. The court agrees.

TELRIC (Total Element Long Run Incremental Cost) is a forward-looking model, rather than one based on historic measure. It is based on the cost of operating a hypothetical network. *See* 47 C.F.R. § 51.505(b)(1)("the most efficient telecommunications technology currently available and the lowest network configuration."). More specifically, the TELRIC model should be based on costs that assume that wire centers will be placed at the incumbent LEC's current wire center locations, but that the reconstructed local network will employ the most efficient technology for reasonably foreseeable capacity requirements. *See GTE South*, 199 F.3d at 746 (citing First Report and Order). As mentioned earlier, in *Iowa Utilities*, the Supreme Court upheld the FCC's rule-making authority in connection with the Telecommunications Act. Therefore, the FCC had the

7

authority to issue the TELRIC measure in its rules.[5]

In this case, the PSC adopted BellSouth's cost model, which was based on its actual network. As the PSC's order ruling on costs states, BellSouth's model "is based on its actual network," "the network it has in place." (Order, pp. 5, 40). The PSC order states that BellSouth's proposed rates are based on TELRIC; however, this description is inconsistent with the assumption that the model is based on BellSouth's actual network. Because the model adopted by the PSC does not comport with the guidelines set forth by the FCC, the court must reverse the PSC's approval of BellSouth's model.

BellSouth presents three major arguments in opposition to the adoption of the TELRIC model. First, it argues that the FCC's TELRIC rule was not in effect at the time the PSC issued its arbitration order in March 1997. The FCC rules were vacated by the Eighth Circuit on jurisdictional grounds. BellSouth contends that the Supreme Court's subsequent decision reinstating the FCC's pricing rules did not resolve the question of whether the rules apply retroactively to the PSC in this case. Moreover, even if the FCC's pricing rules are applicable, BellSouth believes there is ample evidence to support the PSC's decision to reject AT&T's cost model in favor of BellSouth's forward-looking studies. Finally, BellSouth further asserts that the court should hold this issue in abeyance pending the Eighth Circuit's decision on remand of the *Iowa Utilities* case.

The court rejects all three of BellSouth's arguments. First, as to BellSouth's retroactivity argument, this precise contention was soundly refuted recently by the Fourth Circuit in *GTE South*.

---

[5] The Supreme Court did not reach the merits of TELRIC, only whether the FCC had authority to issue the pricing guidelines. The merits of TELRIC are currently before the Eighth Circuit Court of Appeals.

8

The Fourth Circuit held that "the Supreme Court's determination that the FCC has jurisdiction to issue pricing rules would appear to compel the conclusion that the FCC always had such jurisdiction and that the rules apply as of the effective date originally scheduled." 199 F.3d at 740. Thus, there were no retroactivity principles preventing the Fourth Circuit from applying on appeal the FCC's pricing rules. *Id.* at 741. Additionally, in *Bell Atlantic-Virginia*, the Fourth Circuit stated, "although the Supreme Court invalidated one of the FCC rules governing access to unbundled network elements, other (non-pricing) rules relating to local competition have been in effect since October 15, 1996." 197 F.3d at 668 (internal citations omitted). This date, October 15, 1996, was obviously prior to the date of the PSC's decision in this case. Therefore, these Fourth Circuit precedents clearly dictate that questions of retroactivity should not impede this court.

Second, BellSouth's argument, that there is ample evidence to support the PSC's decision to adopt BellSouth's cost model, must similarly be rejected. As earlier discussed, in *GTE South*, the Fourth Circuit Court of Appeals held that a state utilities commission's interpretations of the Telecommunications Act are reviewed de novo, although the commission's fact-findings are reviewed under the substantial evidence standard. The PSC's decision to reject the TELRIC model, which was required under the FCC's rules, constitutes an interpretation of the Telecommunications Act that must be reviewed de novo. The decision does not constitute fact-finding, which this court must review under the substantial evidence standard. When the PSC's decision is reviewed de novo, it is abundantly clear that the PSC erred in failing to follow the FCC's rules, which mandated the TELRIC model. Hence, the court need not foray into deciding whether BellSouth's proposed model was supported by substantial evidence.

Third, BellSouth's argument that the court should hold the case in abeyance pending

9

resolution of the Eighth Circuit's decision need likewise be rejected. In *GTE South*, the Fourth Circuit declined to accept this very argument. It stated: "We realize that should we apply the rules and decide this case now, the Eighth Circuit may later invalidate some or all of the rules." 199 F.3d at 743-44. Nevertheless, the Fourth Circuit ruled on the issues. The parties in *GTE South* had an interconnection agreement that provided for modification should the governing law change. The same is true in this case. Thus, should the law change, that change will become incorporated into the agreement between AT&T and BellSouth. Finally, the Fourth Circuit referenced Congress's intent that the Telecommunications Act take root "as quickly as possible." If this court were to hold this case in abeyance, it is quite possible it would have to do so for years before any finality will be achieved, inasmuch as a further appeal of the Eighth Circuit decision to the United States Supreme Court is quite possible. Holding this decision in abeyance would be inconsistent with the Congressional intent that the Telecommunications Act be expeditiously implemented. Thus, the court finds that the PSC erred in failing to use the TELRIC model, and the court should not delay reaching this holding.

### (2) Most Efficient Technology

AT&T further argues that the PSC's adoption of BellSouth's cost model was erroneous because it failed to utilize the most efficient technology available, as required by 47 C.F.R. § 51.505(b)(1). More specifically, the model failed to incorporate the integrated digital loop carrier ("IDLC") technology, which is the most efficient technology currently available. The court agrees with AT&T.

The regulation provides in relevant part: "The total element long-run incremental cost of an element should be measured based on the *use of the most efficient telecommunications technology*

10

*currently available and the lowest cost network configuration,* given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505(b)(1) (emphasis added). BellSouth has not directly challenged the fact that IDLC technology is the most efficient. Its refusal to provide IDLC appears to have been related to its position that IDLC is integrated into the switch and cannot be separated. With the Supreme Court's reinstatement in *Iowa Utilities* of Rule 315(b), which prohibits incumbents from separating currently combined unbundled network elements, any objection to IDLC would evaporate. In fact, at oral argument, on the IDLC issue, counsel for BellSouth conceded "that that constitutes a combination of elements that are currently combined in [BellSouth's] network that BellSouth now has an obligation to provide." Therefore, the BellSouth model, approved by the PSC, improperly failed to include IDLC technology.

### (3) Unbundled Network Elements

Third, AT&T argues that BellSouth's pricing model, which assumes BellSouth will physically separate unbundled network elements before providing them, fails to comply with Rule 315(b). As elaborated further below, the Supreme Court's decision in *Iowa Utilities* upheld Rule 315(b), which required incumbents to provide unbundled network elements combinations. Because the model approved by the PSC failed to provide already-combined unbundled network elements at cost-based rates, the court finds that the model was illegal.

Inasmuch as the unbundled network elements prices in the agreement and the SGAT are inconsistent with the Act and the FCC rules, this issue must be remanded to the PSC to develop new unbundled network elements prices based on TELRIC (as defined by the FCC rules), utilizing the most efficient technology, and resting on the assumption that BellSouth must provide combinations of unbundled network elements.

11

B. Combining of Unbundled Network Elements

AT&T contends that the agreement improperly fails to require BellSouth to provide unbundled elements at cost-based rates and to permit AT&T to combine those network elements to provide services.[6] The court agrees.

Section 251(c)(3) of the Act provides, "An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." Under 47 C.F.R. § 51.309(a), an

> incumbent LEC [local exchange carrier] shall not impose limitations, restrictions, or requirements on requests for, or the use of, unbundled network elements that would impair the ability of a requesting telecommunications carrier to offer a telecommunications service in the manner the requesting telecommunications carrier intends.

Furthermore, 47 C.F.R. § 51.315 ("Rule 315"), states in relevant part:

> (a) An incumbent LEC shall provide unbundled network elements in a manner that allows requesting telecommunications carriers to combine such network elements in order to provide a telecommunications service.
> (b) Except upon request, an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines.

In *Iowa Utilities*, the Supreme Court reinstated Rule 315(b), which forbids an incumbent to separate already-combined network elements before leasing them to a competitor. The Court found that the FCC's interpretation, as contained in Rule 315(b), of the statute was reasonable. In the

---

[6] The agreement provides:

> If Network Elements are rebundled to produce an existing tariffed retail service, the appropriate price to be charged to AT&T by BellSouth is the wholesale price (discounted retail price).

Section 1.A.

12

absence of Rule 315(b), incumbents could impose wasteful costs on even those carriers who requested less than the whole network. Thus, the underlying statute is as "the Commission [FCC] explains, ... aimed at preventing incumbent LECs from 'disconnect[ing] previously connected elements, over the objection of the requesting carrier, not for any productive reason, but just to impose wasteful reconnection costs on new entrants.'" *Iowa Utilities*, 525 U.S. at 395.

Furthermore, to the extent that the interconnection agreement establishes higher rates for combinations of elements, it violates the cost-based pricing standard of 47 U.S.C. § 252(d)(1). Section 47 U.S.C. § 252(d) provides:

> (1) Interconnection and network element charges
> Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—
> (A) shall be—
> (i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and
> (ii) nondiscriminatory, and
> (B) may include a reasonable profit.

47 U.S.C. § 252(d).

Based on the above authorities, the court concludes that the interconnection agreement improperly forbids AT&T from using unbundled network elements purchased at cost-based rates and from combining those network elements to provide services. Accordingly, the court strikes the above-quoted portion of the interconnection agreement's section 1.A., which contains the offending language.[7]

---

[7] BellSouth, in its post-hearing brief, essentially concedes that section 1.A. should be stricken, but argues that the court should also modify section 30.5, a related provision. The court

13

### C. Vertical Features

AT&T next argues that the agreement unlawfully denies AT&T the right to vertical features of the local switching network element by treating them as retail services subject to resale pricing, and not priced as part of the switching component. In other words, AT&T is arguing that the vertical features are included in the cost of the local switching network element, and there should not be a separate charge for such features.

In *Iowa Utilities*, the Supreme Court upheld the Eighth Circuit's application of the "network element" definition, finding it to be "eminently reasonable." 525 U.S. at 387. The Supreme Court rejected the incumbent LEC's complaint that the FCC included within the features and services that must be provided to competitors under Rule 319 items that do not meet the statutory definition of "network element" - namely, operator services and directory assistance, operational support systems, and vertical switching functions such as caller I.D., call forwarding, and call waiting. Based on this clear precedent, AT&T's argument regarding vertical features must be accepted in this case.

Thus, the agreement and the SGAT violate the Act by failing to require BellSouth to provide vertical features of the unbundled local switching element when AT&T or another competitor purchases the unbundled local switching element at cost-based rates under the Act, and in requiring AT&T to pay a second time, at resale rates, for those vertical services.

### D. Discounts for Resale and Contract Service Arrangements

AT&T next argues that the agreement and SGAT violate the Act and FCC regulations by

---

declines to grant this request because BellSouth has not filed a counter-claim in this matter requesting such relief, and is raising the issue for the first time at this late stage of the proceedings.

14

improperly denying AT&T the wholesale discount for both general retail services and BellSouth's Contract Service Arrangements ("CSAs").

Section 251(c)(4)(A) of the Act requires an incumbent to "offer for resale at wholesale rates any telecommunications service [it] provides at retail to subscribers who are not telecommunications carriers." Because the CSAs are telecommunications services, BellSouth must offer these services for resale to AT&T with the wholesale discount. Furthermore, under Section 251(c)(4)(B), BellSouth has an obligation "not to impose unreasonable or discriminatory conditions or limitations on the resale of such telecommunications service."

The Act requires the PSC to determine wholesale rates on the basis of retail rates charged "excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." 47 U.S.C. § 252(d)(3). AT&T argues that the PSC failed to set a rate meeting this standard because the PSC considered the costs actually avoided by BellSouth, based on the assumption that BellSouth would continue to operate in a wholesale and retail environment. The court agrees with AT&T's position.

In *GTE South*, 199 F.3d at 749, the Fourth Circuit cited the First Report and Order of the FCC regarding the setting of wholesale prices:

> "the portion [of the retail rate] ... attributable to costs that will be avoided" includes all of the costs that the LEC incurs in maintaining a retail, as opposed to wholesale, business. In other words, the avoided costs are those that an incumbent LEC would no longer incur if it were to cease retail operations and instead provide all of its services through resellers. Thus, we reject the arguments of incumbent LECs and others who maintain that the LEC must actually experience a reduction in its operating expenses for a cost to be considered "avoided" for purposes of section 252(d)(3).

The Fourth Circuit held that the state commission's assumption in setting wholesale prices – that the

15

incumbent would exit the retail market altogether – was completely consistent with the FCC's rule.

In the present case, the PSC used an approach inconsistent with the above standards of the Act and the FCC. Because the PSC failed to assume, for purposes of determining wholesale prices, that BellSouth would exit the retail market altogether and thus incur no costs for marketing, billing, collection, and other such items, this court must reverse the PSC and require it to apply the proper standard.[8]

### E. Additional Issues

It its supplemental brief, AT&T raises two new issues regarding deaveraging and collocation. It argues that BellSouth has not deaveraged its loop prices as required by the Act. Further, AT&T asserts that BellSouth's collocation offering is not in compliance with the FCC's order. BellSouth objects to the court's consideration of these issues.

These issues were not raised in AT&T's initial brief. More significantly, they were not raised in the complaint. Thus, it would be improper for the court to consider these wholly new issues.

## III. Specific Issues Raised by MCI

MCI challenges three major matters in BellSouth's SGAT.

### A. Cost and Combination of Network Elements

MCI argues that the SGAT violates the Act by restricting the ability of MCI to purchase network elements at cost-based rates and combine them in any manner it chooses. This issue is the

---

[8] BellSouth argues that this issue is now moot because the PSC has issued an order establishing a separate wholesale discount for CSAs. Although a separate discount may have been set, it is not clear that the new discount was calculated based on the binding law discussed above. Therefore, the court is unable to determine whether the issue is moot.

16

same as one discussed earlier in relation to AT&T. The same result ensues.

### B. Contract Service Arrangements

MCI argues that the SGAT violates the Act by requiring MCI to purchase CSAs at retail, rather than wholesale rates. This is the same issue raised by AT&T. The same result is required, as discussed above.

### C. Performance Measures

MCI finally argues that the SGAT violates the Act by failing to provide for performance measures and standards. This is an issue not previously discussed. The court disagrees with MCI's position.

MCI contends that the Act requires that BellSouth provide access, elements, and services that are at least equal in quality to those BellSouth itself provides. It argues that performance measures and standards are necessary in order to insure that MCI receives quality service from BellSouth. MCI only offers two pieces of authority in support of its position: a reference to an FCC order in another case (*In re Application of Ameritech to Provide In-Region, InterLATA Services*), and FCC's order regarding BellSouth's application to provide long distance service in South Carolina. Although these orders may suggest the desirability of performance measures, MCI has not offered any authority (from the Act, FCC regulations, or case law) mandating performance measures.

Furthermore, in its brief, BellSouth states that it has "committed providing CLECs with performance measures *as part of the SGAT* that will allow them to verify that they are receiving network interconnection and access in accordance with the Act."

For these two reasons – no explicit authority requiring performance measures, and BellSouth's statement that it will provide performance measures – MCI's argument must be rejected

17

by the court.

## CONCLUSION

In summary, as to AT&T's claims, the court rules as follows:

(1) in relation to the pricing of unbundled network elements, the PSC erred in (a) failing to utilize the TELRIC pricing model set forth in the FCC's rules; (b) failing to utilize the most efficient technology as part of the cost model; and (c) establishing higher rates for unbundled elements;

(2) the agreement improperly failed to require BellSouth to provide unbundled elements at cost-based rates and to permit AT&T to combine these elements;

(3) the agreement unlawfully denies AT&T the right to vertical features of the local switching network element;

(4) the wholesale discount in the agreement unlawfully fails to take into account all costs that will be avoided by BellSouth when it acts as a wholesaler, and the agreement and the SGAT violate the Act and FCC regulations by denying AT&T the wholesale discount on BellSouth's Contract Service Arrangements; and

(5) the court will not consider the deaveraging and collocation issues raised by AT&T.

As to MCI's claims, the court rules that:

(1) the SGAT violates the Act by restricting MCI's ability to purchase network elements at cost-based rates and combine them as MCI chooses;

(2) the SGAT violates the Act by requiring MCI to purchase contract service arrangements at retail, rather than wholesale rates; and

(3) the SGAT did not violate the Act by failing to provide for performance measures and standards.

To the extent the PSC's orders are inconsistent with the above rulings, the orders are set aside, the interconnection agreement and SGAT must be reformed, and the matter remanded for resolution consistent with this opinion.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.
United States District Judge

May 24, 2000
Columbia, South Carolina

19

AO 72A
(Rev.8/82)